Gary F. EDWARDS, D.C., Appellant,

v.

MISSOURI STATE BOARD OF CHIROPRACTIC EXAM-INERS, Respondent.

No. WD 59868.

Missouri Court of Appeals, Western District.

April 16, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 2002.

Application for Transfer Denied Oct. 22, 2002.

---

Steven E. Mauer, Kansas City, Edward Downey, Jefferson City, for Appellant.

Sondra Bryan Morgan, Jefferson City, for Respondent.

Before HARDWICK, P.J., ULRICH, J. and HANNA, S.J.

ROBERT G. ULRICH, J.

Gary F. Edwards, D.C., appeals the judgment of the trial court affirming the decisions of the Administrative Hearing Commission (AHC) and the Missouri State Board of Chiropractic Examiners (Board). The AHC found that Dr. Edwards' license to practice chiropractic was subject to discipline for violation of sections 331.060.2(4), (5), (13), (18), and (19)[1] in his treatment of Duane Troyer, a hemophiliac who was HIV positive. Based on the AHC's finding, the Board revoked Dr. Edwards' license to practice chiropractic with imposition of revocation stayed pending Dr. Edwards' successful completion of a two-year suspension and a subsequent five-year probationary period. Dr. Edwards contends on appeal that (1) the AHC's decision that his license was subject to discipline based on the finding that he stated that he had

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

cured Duane's HIV was not supported by competent and substantial evidence upon the whole record; (2) the AHC erred in precluding discovery on matters relating to the credibility of the Board's key witnesses; and (3) the AHC erred in finding that he administered a drug or medicine and attempted to practice medicine in violation of section 331.060.2(19) because (a) his nutrition and counseling plan was consistent with the practice of chiropractic and (b) the Board's complaint did not allege the grounds upon which the AHC found he was subject to discipline.

The judgment of the trial court is reversed, and the case is remanded to the trial court with directions.

## I. FACTS

The Board filed a complaint against Dr. Edwards with the AHC on May 26, 1998. The Board alleged that Dr. Edwards violated several subsections of section 331.060.2 in his treatment of Duane Troyer from May 1990 to August 1992. Duane was a hemophiliac and had tested positive for HIV in April 1989. The Board alleged that during his treatment of Duane, Dr. Edwards represented to Duane and his wife, Regina, that he was capable of treating and eliminating Duane's HIV-positive condition. Dr. Edwards' treatment of Duane included the use of an electronic, computer-based machine referred to as the "Interro." Dr. Edwards also prescribed a variety of herbal and vitamin supplements and a liquid produced by the Interro machine for treatment of Duane's condition. The Board alleged that in November 1990, six months after he began treating Duane, Dr. Edwards telephoned Regina to inform her that he had cured Duane's HIV and that Duane was incapable of transmitting HIV to her. The Board further alleged that Dr. Edwards telephoned Regina's mother, Elizabeth Hershberger, and told

her that Duane's HIV was totally eradicated. Finally, the Board alleged that relying on Dr. Edwards' statement that Duane's HIV condition was cured, Duane and Regina conceived a child. Soon after the baby's birth in May 1992, both Regina and the baby tested positive for HIV. Duane died from complications associated with AIDS in September 1992.

A hearing was held on the complaint in May and June 1999. At the hearing, the Board presented the testimony of Regina and her mother, Elizabeth. Regina and Elizabeth offered the following testimony. Duane learned he was HIV positive in April 1989 after he and Regina were already engaged to be married. In May 1989, the couple along with their parents and other members of their family met with doctors at the University of Missouri Health Sciences Center about Duane's condition. Duane and Regina and their families were educated about the disease, including methods of transmission. Duane and Regina understood that if they were married, they would have to take precautions regarding Duane's blood, that they would have to use a condom and a foam contraceptive during intercourse to prevent transmission of the virus to Regina, and that they would not be able to have children. The doctors also offered to treat Duane with a drug, AZT, but because of the possible side effects and the anticipated expense, Duane elected not to be treated with the drug. Despite advice from Regina's mother, Elizabeth, Regina's brother, and a bishop in their church that they postpone their wedding, Duane and Regina were married in September 1989.

In April 1990, Duane sought treatment for his HIV positive condition from Dr. Edwards because he and Regina had heard that Dr. Edwards had a computer that could diagnose and treat any disease. Regina accompanied Duane to Dr. Ed-

wards' office for his first visit and was present with him in the examination room. Regina first completed a patient history form for Duane where she wrote, "Has been given HIV AIDS contaminated blood" under "Chief Complaint." Next, Duane and Regina watched a video that explained the Interro machine, a small machine connected to a computer monitor. Dr. Edwards then dipped a probe connected to the machine into water and touched it to Duane's fingers, which generated a reading on a bar graph on the computer screen. Dr. Edwards told Duane and Regina that the bars on the graph, which measured from 1 to 100, corresponded to various systems of the body. He stated that the readout indicated that certain systems of Duane's body were out of balance, either too high or too low, and that the object of his treatment was to bring these systems into balance. Dr. Edwards told Duane and Regina that when all of the bars lined up to fifty, Duane's body would be in balance, and his HIV condition would be eradicated. Dr. Edwards then used the results from the Interro machine to recommend for Duane a diet and nutritional supplements. The nutritional supplements were available for sale in Dr. Edwards' office. Dr. Edwards also produced with the machine a small bottle of liquid drops for Duane to take daily. Dr. Edwards told Duane and Regina that the diet, supplements, and drops would help to balance the systems of Duane's body and to eradicate within his body the HIV virus.

After this first visit, Duane began to follow the diet, take the supplements, and use the drops as instructed by Dr. Edwards. Thereafter, he became very sick with fever, nausea, vomiting, and night sweats. Duane and Regina telephoned Dr. Edwards regarding Duane's symptoms. Dr. Edwards told the couple that the symptoms were to be expected and that they indicated that Duane's body was ridding itself of the HIV virus. Dr. Edwards did not suggest that Duane contact a medical practitioner.

Duane saw Dr. Edwards a second time in May 1990, and Regina was again present in the examination room. Dr. Edwards treated Duane with the Interro machine. He told the couple that he was optimistic because the bars on the graph were coming together and that although the treatment may take time, Duane's body would eventually be rid of the HIV virus. Dr. Edwards again produced a bottle of liquid drops with the Interro machine and recommended nutritional supplements. In connection with this visit, Dr. Edwards charged Duane $135, which included charges of $75 for the use of the Interro machine, $20 for the bottle of liquid drops, and $40 for the supplements. Dr. Edwards mailed Duane additional supplements costing $26.50 later in the month.

On Duane's next two visits to Dr. Edwards in June and August 1990, Regina and her mother, Elizabeth, were present with Duane in the examination room. During both visits Dr. Edwards treated Duane with the Interro machine and told Duane, Regina, and Elizabeth that the bars on the computer readout were getting closer to 50 and that the HIV virus in Duane's body would soon be eradicated. During the August visit, Regina asked Dr. Edwards if she and Duane could have children once the virus was eradicated. Dr. Edwards answered that once Duane's body was rid of the virus, it would no longer be transmittable. Elizabeth asked Dr. Edwards if he was certain, and he replied, "Oh yes, Mrs. Hershberger, there's no reason to worry about it. They can have children." For the June visit, Dr. Edwards charged Duane $175, which included charges of $75 for the use of the Interro machine, $20 for the bottle of liquid drops, and $80 for the supplements.

For the August visit, Dr. Edwards charged Duane $221.50, which included charges of $75 for the use of the Interro machine, $20 for the bottle of liquid drops, $101.50 for the supplements, and $25 for manipulation.

Duane next saw Dr. Edwards in September 1990 before he and Regina moved to Montana where Regina had taken a teaching job. Duane was informed that the results from the Interro machine showed that all of the bars were near 50. Dr. Edwards told Duane and Regina that he wanted to perform a blood test to confirm that the virus was eradicated.

Duane returned to Missouri in November 1990, and Dr. Edwards drew a blood sample from him to test for HIV. On November 20, 1990, Dr. Edwards called Regina in Montana and told her that he had received the results from Duane's blood test and that Duane's HIV condition had been eradicated. Dr. Edwards also told Regina that Duane could not transfer the virus to her. When Regina received the telephone call from Dr. Edwards, Duane was traveling back to Montana with Regina's parents. When Duane and Regina's parents arrived in Montana the afternoon of November 21, Regina told them about her conversation with Dr. Edwards. Duane and Regina believed Dr. Edwards when he told Regina on November 20 that Duane's HIV condition was completely eradicated, and as a result, the couple no longer practiced protected sex.

Elizabeth, however, was skeptical that Duane's HIV had been eradicated. She, therefore, called Dr. Edwards when she returned home to Missouri the first week of December. Dr. Edwards told Elizabeth that he was absolutely certain that Duane's HIV had been eradicated, that Duane could not transmit HIV to Regina, and that if Duane and Regina had a child, the child would be healthy.

In May 1991, Duane contracted shingles, and he and Regina telephoned Dr. Edwards for advice. Dr. Edwards suggested that they mix soda with water and put the mixture on the sores. Duane next saw Dr. Edwards in August 1991 for a follow-up visit. Again, Regina was present in the examination room. Although Duane appeared to be in good health, Dr. Edwards tested him with the Interro machine to ensure that the systems of his body were still in balance. The monitor attached to the machine showed that the bars lined up at 50, and Dr. Edwards told Duane and Regina that the HIV was eradicated. On this visit, Dr. Edwards charged Duane for the use of the Interro machine and for nutritional supplements.

At the end of September 1991, Regina realized that she was pregnant. She told her mother, Elizabeth, the news the second week of October. Elizabeth telephoned Dr. Edwards twice on November 2, 1991, to inform him that Regina was pregnant. Dr. Howell, a medical doctor in Brookfield, Missouri, was Regina's physician during her pregnancy and delivered her baby. Regina never told Dr. Howell that Duane was HIV positive because she no longer believed that he was. While Regina was in labor, however, Elizabeth told Dr. Howell of Duane's possible HIV status.

Duane and Regina's daughter, Sara, was born on May 20, 1992. Shortly after the baby's birth, Regina and the baby tested positive for HIV. Duane and Regina were devastated when they heard the test results, and Duane soon became very ill. Duane's grandparents and parents encouraged him to return to Dr. Edwards, and he did in July 1992. Although Regina was not in the examining room with Duane during the visit, from the hall she heard Dr. Edwards tell Duane that his symptoms had nothing to do with AIDS.

Shortly after this visit, Duane and Regina went to Montana for a vacation with Regina's parents. While in Montana, Duane became sicker. He immediately returned to Missouri and checked into Audrain Medical Center for a few days. He then returned home but was subsequently hospitalized in Brookfield. From the hospital in Brookfield, Duane was sent to Boone Hospital in Columbia. The doctors at Boone Hospital determined that Duane had AIDS and spinal meningitis and that there was nothing more they could do for him. Duane was then transported home in an ambulance where he died on September 2, 1992.

At the hearing, Dr. Edwards denied ever telling Duane, Regina, or Elizabeth that he was capable of treating and eliminating Duane's HIV condition or that Duane's HIV was totally eradicated. Relying on his handwritten and typewritten progress notes, Dr. Edwards offered the following testimony regarding his treatment of Duane. Dr. Edwards had previously treated David Troyer, Duane's father, and learned of Duane's HIV positive condition from him. Dr. Edwards told David Troyer that although he had never treated a person with HIV, he believed he could provide Duane with nutritional counseling. On Duane's first office visit in April 1990, Dr. Edwards wrote on his patient history form, "No symptoms, seeks nutritional counsel to help strengthen immune system for fight against possible AIDS." In his treatment of Duane, Dr. Edwards utilized the Interro machine to establish a "baseline" from which he could outline treatment and measure progress. Dr. Edwards attempted to bolster Duane's immune system with diet, nutritional supplements, and a homeopathic remedy produced by the Interro machine.

At Duane's September 1990 office visit, Dr. Edwards noted that Duane was feeling well and that his work activity was unrestricted. Dr. Edwards utilized the Interro machine during this visit and found that all of the points were in balance at 50. Dr. Edwards, therefore, decided to assess Duane's condition with a blood test. In November 1990, Dr. Edwards took a blood sample from Duane to test for HIV. On November 20, 1990, he telephoned Regina in Montana informing her that the test result was positive. Dr. Edwards then telephoned Duane the following morning at his parent's home in Paris, Missouri, and told him that the test result was positive. Duane's father, David Troyer, testified by deposition that immediately after Dr. Edwards call, Duane told him the HIV test was positive. David Troyer testified that Duane never told him that his HIV was cured. Vera Troyer, Duane's mother, also testified by deposition that Duane never told her that his HIV was cured. Dr. Edwards denied having a conversation with Elizabeth in December 1990 about Duane's test results, and he introduced Elizabeth's telephone records that showed that no call was placed to him in December 1990 from Elizabeth's home phone.

Dr. Edwards next saw Duane in his office on August 29, 1991. During that visit, Duane and Regina asked Dr. Edwards about starting a family. Dr. Edwards advised the couple against it due to the risk of HIV infection from unprotected sex. The couple then told Dr. Edwards that they had already engaged in unprotected sexual intercourse. Dr. Edwards denied ever telling Duane or Regina that they could safely try to start a family.

Dr. Edwards' records included typed patient notes regarding Duane. On cross-examination, Dr. Edwards admitted that making typewritten patient notes was not his normal practice, that he only did so at the request of an outside party or at his own discretion, and that prior to Duane

Troyer, he had never made typewritten patient notes at his own discretion.

Following the hearing, the AHC issued its order in February 2000 finding that Dr. Edwards' license to practice chiropractic was subject to discipline under five grounds of section 331.060.2. First, the AHC found Dr. Edwards' license was subject to discipline under section 331.060.2(5). Subsection 5 provides the following ground for disciplinary action:

> (5) Incompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties of any profession licensed or regulated by this chapter.

§ 331.060.2(5). The AHC found that Dr. Edwards represented that his treatment could cure HIV/AIDS and that Duane was, in fact, cured. In making this finding, the AHC specifically found that Regina's and Elizabeth's testimony was credible. The AHC concluded that these representations by Dr. Edwards constituted incompetency, misconduct, fraud, misrepresentation, and dishonesty.

Secondly, the AHC found that Dr. Edwards' license was subject to discipline under section 331.060.2(18). Subsection 18 provides the following ground for disciplinary action:

> (18) Engaging in unprofessional or improper conduct in the practice of chiropractic.

§ 331.060.2(18). Under this ground, the AHC found that Dr. Edwards' conduct in representing that he could cure HIV/AIDS and that Duane was cured, especially knowing the risk to Regina and any children they might have, was highly unprofessional and improper.

The AHC next found that Dr. Edwards' license was subject to discipline under subsection 4 of section 331.060.2, which provides the following ground for disciplinary action:

> (4) Obtaining or attempting to obtain any fee, charge, tuition or other compensation by fraud, deception or misrepresentation.

§ 331.060.2(4). Having found that Dr. Edwards committed fraud and misrepresentation in representing that he was capable of treating Duane's HIV, the AHC specifically concluded that Dr. Edwards obtained his fees by fraud, deception, and misrepresentation.

The AHC also found that Dr. Edwards' license was subject to discipline under section 331.060.2(13):

> (13) Violation of any professional trust or confidence.

§ 331.060.2(13). The AHC determined that by representing that he was capable of treating a condition that he knew was incurable, and by performing treatments that he knew could not successfully treat that condition, Dr. Edwards violated the professional trust and confidence placed in him by Duane and Regina.

Finally, the AHC found that Dr. Edwards' license to practice chiropractic was subject to discipline under section 331.060.2(19). Subsection 19 provides the following ground for disciplinary action:

> (19) Administering or prescribing any drug or medicine or attempting to practice medicine, surgery, or osteopathy within the meaning of chapter 334, RSMo.

§ 331.060.2(19). The AHC determined that the homeopathic drops produced by the Interro machine and prescribed by Dr. Edwards to Duane were not designed to merely provide nutrients to the body, as would a vitamin or mineral, but were purported to alter the chemical composition of the body and correct an electrical imbalance in the body in response to a specific

disease process. As such, the AHC concluded that Dr. Edwards was prescribing or administering a medicine and was attempting to practice medicine. The AHC further found that Dr. Edwards attempted to practice medicine when he suggested ginger ale to help with Duane's nausea and vomiting; apple cider vinegar soaks for the treatment of Duane's symptoms of fever, cough, and night sweats; and increasing calcium lactate, as well as baking soda soaks, for the treatment of Duane's shingles.

The AHC delivered its findings of fact and conclusions of law along with the record of the proceedings before it to the Board. Thereafter, the Board set a hearing for the purpose of determining the appropriate disciplinary action. Following the hearing, the Board issued its order revoking Dr. Edwards' license. The Board, however, stayed the imposition of revocation pending Dr. Edwards' successful completion of a two-year suspension and a subsequent five-year probationary period.

Dr. Edwards sought judicial review of the AHC/Board decision in the trial court under section 536.140. The trial court entered judgment affirming the AHC's and the Board's decisions. This appeal by Dr. Edwards followed.

## II. STANDARD OF REVIEW

■ The appellate court reviews the decision of the AHC, not the judgment of the trial court. *State Bd. of Nursing v. Berry,* 32 S.W.3d 638, 640 (Mo.App. W.D. 2000). For purposes of review, the action of the AHC and the disciplinary order of the Board are treated as one decision. § 621.145; *State Bd. of Registration for Healing Arts v. Masters,* 512 S.W.2d 150, 159 (Mo.App.1974).

■ The function of the appellate court is to determine primarily whether the AHC's decision is supported by competent and substantial evidence upon the whole record, is arbitrary, capricious or unreasonable, or constitutes an abuse of discretion. § 536.140.2; *Greene County v. Hermel, Inc.,* 511 S.W.2d 762, 768 (Mo.1974); *Berry,* 32 S.W.3d at 640.

■ The appellate court considers the evidence and all reasonable inferences from the evidence in the light most favorable to the administrative agency's findings. *Berry,* 32 S.W.3d at 640. It may not determine the weight of the evidence or substitute its discretion for that of the AHC. *Hermel,* 511 S.W.2d at 768. "The fact-finding function rests with the AHC, and even if the evidence would support either of two findings, the court is bound by the AHC's factual determination." *Berry,* 32 S.W.3d at 640. While an appellate court cannot substitute its own judgment on factual matters, it can independently determine questions of law. *Id.* at 641.

## III. DISCOVERY

In his second point on appeal, which is dispositive in this appeal, Dr. Edwards claims that the AHC erred in precluding discovery on matters relating to the credibility of the Board's key witnesses, Regina Troyer and Elizabeth Hershberger. Dr. Edwards sought to discover the daily journals of Elizabeth, potentially inconsistent statements made by Regina in previous litigation concerning her HIV infection, and correspondence from the Board to Elizabeth, its expert, and others concerning the complaint. He contends that the AHC abused its discretion in denying him discovery of these materials because the credibility of Regina and Elizabeth was central to his defense and the materials were directly relevant to the substance of the witnesses' testimony.

■ The Board initially claims that Dr. Edwards failed to preserve this issue for appellate review. The Board first argues that Dr. Edwards failed to raise the issue of discovery of Elizabeth's journals and of correspondence from the Board to Elizabeth, its expert, and other again at the hearing before the AHC, therefore, the issue was not preserved for review.[2] The Board cites two cases, *State v. Evans*, 639 S.W.2d 820 (Mo.1982), and *State v. Ermatinger*, 752 S.W.2d 344 (Mo.App. E.D. 1988), for the proposition that a ruling on a pre-trial motion is interlocutory, and, therefore, the motion must be renewed at trial to preserve the issue for review. These two cases, however, are distinguishable from this case. In *Evans* and *Ermatinger*, the defendants filed pre-trial motions seeking to prevent the State from introducing certain evidence. *See Evans*, 639 S.W.2d at 821–822 (the defendant, whose name was Alfonso Capone Evans, filed a motion in limine asking the trial court to order the prosecutor to refrain from referring to him as "Al Capone," "Capone," or any other similar name because such references would draw an analogy to the infamous underworld figure); *Ermatinger*, 752 S.W.2d at 348 (the defendant filed a pre-trial motion to compel the prosecuting witness to submit to an independent psychiatric examination to determine whether the witness was competent to testify). Because the defendants in those cases failed to object when the references were made or the witness testified at trial, the issues were not preserved for review. *Evans*, 639 S.W.2d at 822; *Ermatinger*, 752 S.W.2d at 348–349. Unlike *Evans* and *Ermatinger*, this case involves an effort to discover materials relevant to the disciplinary proceeding or otherwise reasonably calculated to lead to the discovery

of admissible evidence. Dr. Edwards was denied discovery of certain materials. Unlike *Evans* and *Ermatinger*, Dr. Edwards was not attempting to prevent the introduction of evidence or to introduce evidence at the hearing. He was not required to present the discovery matters again to the AHC at the hearing to preserve the issue for appeal.

■ Next, the Board argues that Dr. Edwards failed to preserve the discovery issue for appellate review because the discovery motions and rulings were not part of the record on appeal before the trial court. Circuit and appellate court review of an administrative decision is limited to matters raised in the petition for review. § 536.140.1; *Fitzgerald v. City of Maryland Heights*, 796 S.W.2d 52, 58 (Mo.App. E.D.1990). In his amended petition for review, Dr. Edwards alleged that the AHC abused its discretion in denying discovery of Elizabeth's journals, statements made by Regina in previous litigation, and correspondence from the Board to Elizabeth, its expert, and others. Because the record certified by the AHC and the Board to the trial court did not contain the discovery motions and rulings, Dr. Edwards filed a motion requesting the trial court to enter an order compelling the AHC and the Board to supplement and certify such documents as part of the legal record. The trial court denied Dr. Edwards' motion finding that the record was sufficient for its review. The trial court thereafter entered judgment affirming the AHC's and the Board's decisions. The discovery issue was raised in Dr. Edwards' amended petition for review, and the trial court ruled on the issue. The discovery issue was pre-

---

**2.** The Board admits that the issue of discovery of statements made by Regina in prior litiga-

tion was preserved for review.

served for appellate review.[3]

■ Finally, the Board claims that a writ of prohibition was the appropriate remedy to challenge the AHC's discovery decisions. While the denial of discovery matters has been held to be reviewable upon a petition for writ of prohibition, *See Ferrellgas, L.P. v. Williamson*, 24 S.W.3d 171 (Mo.App. W.D.2000), such issue has also been reviewed on direct appeal. *See, e.g., Herman v. Andrews*, 50 S.W.3d 836 (Mo.App. E.D.2001); *Misischia v. St. John's Mercy Med. Ctr.*, 30 S.W.3d 848 (Mo.App. E.D.2000). The discovery issues in this case are reviewable in this appeal.

■ Discovery has several purposes including eliminating surprise, aiding in the ascertainment of the truth, narrowing issues, facilitating trial preparation, and obtaining relevant information. *Spacewalker, Inc. v. Am. Family Mut. Ins. Co.*, 954 S.W.2d 420, 423 (Mo.App. E.D.1997). Any party in a licensing case before the AHC may obtain discovery in the same manner as is provided by Missouri Supreme Court Rules for discovery in civil actions in circuit court. § 536.073.2; 1 CSR 15–2.420(1) (2001). Rule 56.01(b)(1) provides, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action...." Relevant materials include materials reasonably calculated to lead to the discovery of admissible evidence. *State ex rel. Wilson v. Davis*, 979 S.W.2d 253, 255 (Mo.App. S.D.1998). "[I]n a disciplinary proceeding the licensee, as a matter of fair play, should be allowed to discover, within the Rules, all materials relating to those proceedings." *Bd. of Registration for Healing Arts v. Spinden*, 798 S.W.2d 472, 478 (Mo.App. W.D.1990).

■ Determining the appropriate scope of discovery involves "the pragmatic task of weighing the conflicting interests of interrogator and the respondent." *State ex rel. LaBarge v. Clifford*, 979 S.W.2d 206, 208 (Mo.App. E.D.1998)(quoting *State ex rel. Anheuser v. Nolan*, 692 S.W.2d 325, 328 (Mo.App. E.D.1985)). In ruling on an objection to a discovery request, the trial court must not only consider questions of privilege, work product, relevance, and the tendency of the request to lead to the discovery of admissible evidence, it must also balance the need of the interrogator to obtain the information against the respondent's burden of furnishing it, including the extent to which the request will be an invasion of privacy, particularly the privacy of a non-party. *LaBarge*, 979 S.W.2d at 208; *Anheuser*, 692 S.W.2d at 328. Rule 56.01(c) allows for protective orders to address such concerns. It provides, "Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Rule 56.01(c). Thus, even though information sought is properly discoverable, upon objection the trial court should consider whether the information runs against an interest in privacy or against an assertion that the proposed discovery is burdensome. *State ex rel. Creighton v. Jackson*, 879 S.W.2d 639, 642 (Mo.App. W.D.1994); *Anheuser*, 692 S.W.2d at 328.

---

**3.** Dr. Edwards included the documents pertaining to discovery in his legal file filed in this court. The Board filed a motion to strike those documents from the record on appeal. This court denied the motion to strike finding that all the documents contained in the record on appeal were properly certified as having been filed in the Circuit Court of Jackson County for Circuit Court review.

Decisions pertaining to discovery are reversed only for an abuse of discretion. *Spinden,* 798 S.W.2d at 475. Discretion is abused when the ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Redfield v. Beverly Health & Rehab. Servs., Inc.,* 42 S.W.3d 703, 711 (Mo.App. E.D.2001).

## A. Elizabeth's Journals

Dr. Edwards first claims that the AHC abused its discretion in precluding discovery of Elizabeth's journals in which she chronicled the daily events of her life. He contends that the denial of production of Elizabeth's journals unlawfully limited his ability to meet and rebut the allegations made against him. Specifically, Dr. Edwards claims that if he had been permitted to review the journals, he may have bolstered his theory that Elizabeth recorded matters of much less importance in 1990 than his "alleged announcement of a miraculous cure." Dr. Edwards also argues that the AHC abused its discretion in refusing him discovery of journal entries for two specific dates, November 20 and 21, 1990. Dr. Edwards testified that he called Duane at Duane's father's home in Missouri on November 21 and told him his HIV test was positive. Duane's father corroborated this testimony. Elizabeth's testimony contradicted Dr. Edwards' version of the events. She testified that Duane was traveling with her on that day back to Montana. Dr. Edwards contends that Elizabeth's journal entries for those days would have been significant to both witness credibility and to the substance of

the information he conveyed to Duane on those days.

In his notice of deposition for Elizabeth, Dr. Edwards requested Elizabeth to produce "[a]ll logs, diaries, letters, or documents of any kind that refer to Dr. Edwards or that refer to any treatment by or representations of Dr. Edwards to Regina Troyer, Duane Troyer, or to Elizabeth Hershberger or any other individual or entity."[4] Elizabeth reviewed her journals and identified those entries that referenced Duane's illness and his treatment by Dr. Edwards. She then copied those entries and provided them to Dr. Edwards. The Board then filed a motion requesting the AHC to issue a protective order limiting Dr. Edwards' request for production of Elizabeth's journals to only those entries that were pertinent and relevant to the proceeding. The Board explained that the journals contained entries regarding Elizabeth's personal feelings regarding her marriage, her family, her religion, and other matters of an extremely personal nature unrelated to the issues and that production of the journals would subject Elizabeth to extreme embarrassment and personal anguish. The AHC temporarily granted the motion for protective order as to the deposition and ordered the Board to deliver Elizabeth's journals for the period during which Dr. Edwards treated Duane to the AHC for an *in camera* review. After the AHC reviewed the journals, it issued an order denying the Board's motion for protective order as to seven additional entries identified as relevant to the issues of the proceeding, and those entries were provided to Dr. Edwards by the Board.

Dr. Edwards argues that the AHC abused its discretion in refusing to allow him to discover Elizabeth's journals

---

4. Although the notice of deposition for Elizabeth was not found in the record on appeal, Dr. Edwards' request for production of these documents was found in the AHC's May 6, 1999, order issued in response to the Board's motion for protective order.

in their entirety. In his notice of deposition of Elizabeth, Dr. Edwards requested Elizabeth to produce all logs, diaries, letters, or documents of any kind that referred to him or his treatment of Duane. The AHC conducted an *in camera* review of the journals to determine the relevant entries under Dr. Edwards' request and concluded that seven entries in addition to those already produced by Elizabeth were relevant. The AHC did not abuse its discretion in denying Dr. Edwards' discovery request to the extent that the remaining entries were irrelevant under Rule 56.01(b)(1) or in entering an order under Rule 56.01(c) protecting Elizabeth from potential embarrassment resulting from the discovery of journal entries that contained her deeply personal thoughts. Dr. Edwards claims that other entries, for example the entries for November 20 and 21, 1990, were also relevant in this case. Dr. Edwards' request for production of documents, however, focused on entries that were relevant because they referred to him or his treatment of Duane. A reasonable inference is that because the AHC did not allow Dr. Edwards to discover the journal entries for November 20 and 21, 1990, the entries did not refer to him or his treatment of Duane. Dr. Edwards never requested entries that were relevant for other reasons, such as Duane's location on those two dates, when he ultimately learned of their potential relevancy. The AHC, therefore, did not abuse its discretion in restricting Dr. Edwards' discovery of Elizabeth's journal to those entries that referred to him or his treatment of Duane, as stated in his request, and in protecting the remaining entries of Elizabeth's private journals from discovery.

### B. Regina's Statements from Previous Litigation

Dr. Edwards next claims that the AHC abused its discretion in denying him discovery of potentially inconsistent statements made by Regina in previous litigation. At their depositions, Dr. Edwards attempted to question Regina and Elizabeth about Regina's involvement in a blood factor concentrate litigation. Both refused to answer the questions. Thereafter, Dr. Edwards filed motions for enforcement of discovery requesting the AHC to order Regina and Elizabeth to answer the questions concerning Regina's involvement in the blood factor concentrate litigation. The AHC ruled against Dr. Edwards finding that Regina's participation in the prior lawsuit was irrelevant to her credibility.

In the hearing before the AHC, Dr. Edwards made an offer of proof regarding his inability to develop evidence in discovery concerning this litigation. In his offer of proof, Dr. Edwards stated that Regina filed three claims and participated in litigation concerning HIV infections caused by contaminated blood factor concentrates. She received a $300,000 settlement in the litigation, $100,000 each for Duane, herself, and their daughter. Dr. Edwards explained that he sought discovery of the claims Regina asserted in the settlement, specifically, Regina's statements concerning how she and her daughter contracted HIV. Dr. Edwards argued that if Regina asserted that she and her daughter were infected because a chiropractor told her and Duane that Duane was cured, an intervening cause may have existed to reduce or eliminate the settlement for which she and her daughter were eligible. Because Regina did recover $100,000 for herself and $100,000 for her daughter, Dr. Edwards argued, Regina must not have made such a claim concerning his treatment of Duane. Dr. Edwards contended that such matters were relevant in this disciplinary proceeding because if Regina had made inconsistent claims in the prior litigation with respect to the reason she contracted

HIV, those statements would have significantly undermined her credibility.

The AHC abused its discretion in precluding Dr. Edwards from discovery of statements made by Regina in the blood factor concentrate litigation based on relevancy. Statements or claims made by Regina in that litigation regarding how she contracted HIV were relevant to the subject matter in this disciplinary proceeding or were reasonably calculated to lead to the discovery of admissible evidence. In its complaint against Dr. Edwards, the Board alleged that Dr. Edwards' treatment of Duane violated several subsections of section 331.060.2. The Board alleged that during his treatment of Duane, Dr. Edwards represented to Duane, Regina, and Elizabeth that he was capable of treating and eliminating the HIV virus in Duane's body and that he, in fact, did cure Duane's HIV. The Board also alleged that Dr. Edwards utilized the Interro machine including liquid drops produced by the machine in treating Duane's HIV condition. A central issue in this case was Dr. Edwards' representations to Duane, Regina, and Elizabeth regarding whether he could treat and cure Duane's HIV condition. Statements made by Regina concerning how she contracted HIV were relevant to this issue.

Additionally, the information sought by Dr. Edwards for impeachment purposes is within the scope of discovery as defined in Rule 56.01(b)(1). *State ex rel. Creighton v. Jackson,* 879 S.W.2d 639, 642–643 (Mo. App. W.D.1994); *Willis v. Brot,* 652 S.W.2d 738, 739 (Mo.App. E.D.1983). "Information showing that a person having knowledge of discoverable facts may not be worthy of belief is always relevant to the subject matter of the action." *Willis,* 652 S.W.2d at 739 (quoting 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCE-DURE § 2015, at 208 (2d ed.1994)). "Inconsistent statements, criminal convictions, proof of bias, and similar material, being themselves admissible evidence, cannot be excluded from the scope of discovery." WRIGHT, MILLER & MARCUS, *supra,* § 2015, at 209.

The AHC found Dr. Edwards' license to practice chiropractic subject to discipline based on its finding that he represented to Duane, Regina, and Elizabeth that he was capable of treating and eliminating Duane's HIV and that Duane was, in fact, cured. Regina's and Elizabeth's testimony provided the only evidence at the hearing that Dr. Edwards made such representations. In making the specific finding regarding Dr. Edwards' representations, the AHC found that Regina's and Elizabeth's testimony was credible. Because Regina's and Elizabeth's testimony alone formed the basis of the AHC's decision to discipline Dr. Edwards' license based on his representations, any information affecting their credibility was relevant to this proceeding. The AHC, therefore, abused its discretion in denying Dr. Edwards discovery of statements or claims made by Regina in the blood factor concentrate litigation regarding how she contracted HIV. The cause must be remanded to the AHC for directions to allow Dr. Edwards further discovery of claims made by Regina in the blood factor concentrate litigation regarding how she contracted HIV.

### C. Correspondence from the Board to Elizabeth, the Board's Expert, and Others

Dr. Edwards next claims that the AHC abused its discretion in precluding discovery of letters from the Board to Elizabeth, its expert, and others. The Board provided Dr. Edwards with a "privilege log" listing these documents, among others, that the Board did not disclose in response

to Dr. Edwards' request for production of documents. The documents include three letters from the Board's attorney to Dr. Thomas Duke, two letters from the Board's attorney to Elizabeth, one letter from the Board's attorney to John H. Renner, M.D., and one letter from the Board's attorney to Lisa N. Gentlemen, an attorney of a fact witness. The privilege log contained a brief description of the documents and the privilege asserted. Thereafter, Dr. Edwards filed a motion to enforce discovery requesting the AHC to order the Board to produce the documents listed in the Board's privilege log. The AHC conducted an *in camera* review of the letters and issued an order denying Dr. Edwards' motion to enforce discovery finding that all but one of the letters contained opinion work product and were, therefore, not discoverable. The AHC also found that while the last letter from the Board to its expert did not contain opinion work product, it was trial preparation material, and Dr. Edwards failed to make the required showing under Rule 56.01(b)(3) of substantial need.

Rule 56.01(b)(3) protects work product from discovery. It provides in pertinent part:

Subject to the provisions of Rule 56.01(b)(4), a party may obtain discovery of documents and tangible things otherwise discoverable under Rule 56.01(b)(1) and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative, including an attorney, consultant, surety, indemnitor, insurer, or agent, only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and that the adverse party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such

materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Rule 56.01(b)(3). Work product applies to two types of information: opinion work product and trial preparation materials. *Spinden*, 798 S.W.2d at 476. "Opinion work product concerns the client's litigation and includes mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party." *Id.* Opinion work product is absolutely immune from discovery. Rule 56.01(b)(3); *Spinden*, 798 S.W.2d at 476.

Trial preparation materials, on the other hand, are qualifiedly immune from discovery. *Spinden*, 798 S.W.2d at 477. To be protected from discovery, trial preparation materials must be (1) documents or tangible things, (2) prepared by or for a party or that party's representative, (3) in anticipation of litigation or for trial. Rule 56.01(b)(3); *Spinden*, 798 S.W.2d at 477. If all of the requirements are met, trial preparation materials may be discovered only if the party seeking discovery shows a substantial need for the material in the preparation of the case and an inability to obtain the substantial equivalent without undue hardship. Rule 56.01(b)(3); *Spinden*, 798 S.W.2d at 477.

Dr. Edwards first argues that the requested letters were merely prepared in the ordinary course of the Board's business and, thus, were not trial preparation materials protected from discovery. Dr. Edwards relies on the case, *Board of Registration for the Healing Arts v. Spinden*, 798 S.W.2d 472 (Mo.App. W.D.1990). In *Spinden*, a physician in a disciplinary proceeding sought to discover investigative materials prepared by the Board of Registration for the Healing Arts including inci-

dent, occurrence or investigative reports possessed by the Board, reports created by the Board relating to the facts in the complaint, statements taken relating to the facts, and documents provided by the Board to any person expected to be called as an expert witness. *Id.* at 473–474. The court found that those materials were prepared in the ordinary course of the Board's business to investigate, recommend, and mete out discipline and to file and prosecute complaints against licensed physicians. *Id.* at 478. Thus, the court held that the materials sought by the physician were not protected from disclosure by the work product exception for trial preparation materials. *Id.*

Additionally, Dr. Edwards argues that even if the letters were work product, the Board waived its work product immunity when it disclosed the letters to third parties, i.e. Elizabeth, a non-party witness. Work product immunity may be waived by voluntary disclosure of the protected information. *State ex rel. Mitchell Humphrey & Co. v. Provaznik*, 854 S.W.2d 810, 813 (Mo.App. E.D.1993). A disclosure made in the pursuit of trial preparation and not inconsistent with maintaining secrecy against opponents should, however, be allowed without waiver of the work product immunity. *Id.*

Unlike in *Spinden,* the letters sought by Dr. Edwards in this case were not merely investigative materials prepared by the Board in its ordinary course of business. The letters at issue in this case were written by the Board's attorney to Elizabeth, the Board's expert, and others. The AHC reviewed the letters *in camera* and determined that they contained opinion work product or trial preparation materials. The AHC did not abuse its discretion in finding that the Board's attorney's communication with Elizabeth, a fact witness, and her attorney regarding this litigation did not constitute a waiver of the Board's work product immunity. Likewise, the AHC did not abuse its discretion in denying Dr. Edwards' discovery request to the extent that the letters from the Board's attorney to Elizabeth and Ms. Gentlemen contained the Board's attorney's mental impressions, legal theories or trial strategy.

The Board's opinion work product immunity, however, was waived regarding the letters from the Board's attorney to Dr. Duke, its testifying expert. While Rule 56.01(b)(3) states that opinion work product is protected from discovery, it is subject to the provisions of Rule 56.01(b)(4). Rule 56.01(b)(3). Rule 56.01(b)(4) provides for discovery of "facts known and opinion held" by experts retained for litigation once they have been designated as trial witnesses. *State ex rel. Tracy v. Dandurand*, 30 S.W.3d 831, 834 (Mo.banc 2000). The rule further provides, "A party may discover by deposition the facts and opinions to which the expert is expected to testify." Rule 56.01(b)(4)(b). "Missouri cases require an expert to produce at deposition the materials that the expert has reviewed in order that the opposing attorney be able to 'intelligently cross-examine the expert concerning what facts he used to formulate his opinion'." *Tracy*, 30 S.W.3d at 835 (quoting *State ex rel. Seitrich v. Franklin*, 761 S.W.2d 756, 758 (Mo.App. S.D.1988)). Rule 56.01(b)(4) provides a "bright line" rule that all material given to and reviewed by a testifying expert must, if requested, be disclosed. *Id.* at 836; *Brown v. Hamid*, 856 S.W.2d 51, 54 (Mo. banc 1993). This bright line rule includes both trial preparation materials and opinion work product that is given to and reviewed by the expert. *Tracy*, 30 S.W.3d at 835–836 (where a confidential attorney's report written by the party's attorney and a letter from the attorney to the party that were inadvertently given to

and reviewed by the party's expert were discoverable under Rule 56.01(b)(4)); *Lamonds v. General Motors Corp.*, 180 F.R.D. 302, 305–306 (W.D.Va.1998) (where two documents that were created by a party's legal team and provided to and considered by experts retained by the party to formulate their opinions were discoverable even though the documents contained opinion work product).

■ Under the bright line rule of Rule 56.01(b)(4), the three letters from the Board's attorney to Dr. Duke, its testifying expert, were discoverable, even though they contained trial preparation materials or opinion work product, if Dr. Duke reviewed them in forming his opinion. The AHC, therefore, abused its discretion in denying Dr. Edwards discovery of these letters based on the work product doctrine, and its decision must be reversed. Because the record is unclear whether Dr. Duke reviewed the letters in forming his opinion, the case must be remanded for such determination. The letter from the Board's attorney to Dr. Renner regarding potential expert testimony, however, was not discoverable. Dr. Renner was not designated by the Board as a trial witness. "The discovery of facts known and opinions held by an expert are, until the expert is designated for trial, the work product of the attorney retaining the expert." *Tracy*, 30 S.W.3d at 834. The AHC did not, therefore, abuse its discretion in denying Dr. Edwards discovery of the letter to Dr. Renner.

## IV. CONCLUSION

The judgment of the trial court affirming the decisions of the AHC and the Board is reversed, and the case is remanded to the trial court with directions consistent with this opinion. Because, on remand, the discovery issue may ultimately affect the trier of fact's credibility determi-

nations and decision, Dr. Edwards' points I, III, and IV regarding the AHC's decision that his license to practice chiropractic was subject to discipline are not addressed in this opinion.

HARDWICK, P.J. and HANNA, S.J. concur.