

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00034-CR

TORONTO E. LOCKRIDGE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 38675-B

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Before drug dealer Kelvin Muckleroy was fatally shot in his own kitchen, his live-in girlfriend, Kamica Barron, trying to protect her children in a closet toward the rear of the same house, heard Muckleroy plead, "Trigger, don't kill me, please don't kill me. It don't have to be like this." She then heard three gunshots.

Toronto E. Lockridge, identified at trial as "Trigger," was convicted of murdering Muckleroy and was sentenced to life in prison, at least in part based on the testimony of an accomplice, Brandon Horne. He appeals on numerous grounds.[1]

We affirm the judgment of the trial court because (1) admitting Horne's testimony was proper, (2) sufficient evidence supports Lockridge's conviction, (3) no error was preserved regarding the admission of Lockridge's prior testimony, (4) lack of an accomplice-witness instruction was not egregiously harmful, and (5) counsel's failure to request an accomplice-witness instruction was not prejudicial.

*(1)*     *Admitting Horne's Testimony Was Proper*

Horne, also known as "Bull," was reportedly at the residence with Lockridge and Muckleroy at the time of the shooting. Lockridge argues that the trial court erred in allowing Horne's testimony from a previous trial to be read to the jury. We review for an abuse of discretion the trial court's decision to admit evidence. *Cameron v. State*, 241 S.W.3d 15, 19

---

[1]On appeal, Lockridge argues that: the trial court erred in allowing the testimony of an accomplice given at a previous trial which resulted in a mistrial, the evidence is legally insufficient to support his conviction, the court erred in allowing Lockridge's previous testimony to be admitted after finding he was "unavailable" "to be called as a witness due to his 5th Amendment right against incrimination," the court erred in failing to give an accomplice witness instruction sua sponte, and his attorney rendered ineffective assistance of counsel in failing to request an accomplice witness instruction.

(Tex. Crim. App. 2007). "A trial court does not abuse its discretion if the decision to admit evidence is within the 'zone of reasonable disagreement.'" *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed." *Id.* (citing *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379). We will not substitute our own decision for that of the trial court. *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

Horne was called, but refused to testify at Lockridge's trial. The trial court informed Horne that he had "the constitutional right not to answer questions" "because [Horne] still ha[d] a case pending." Horne invoked this right, and the trial court determined that, "[b]y invoking his constitutional rights, that also makes him unavailable to testify." The State then sought to introduce sworn testimony Horne had given in Lockridge's previous trial for this charge, which resulted in a mistrial. Lockridge's counsel objected to the reading of the transcript on the ground that Horne was available to testify because he was present and because he would "not have an opportunity to confront him." Finding that Lockridge had the opportunity to cross-examine Horne at the previous trial, the court allowed the direct and cross-examinations of Horne from the previous trial to be read.

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted" and is generally not admissible unless allowed "by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 801(d), 802.

3

Rule 804 of the Texas Rules of Evidence provides:

> The following are not excluded if the declarant is unavailable as a witness:

> (1) *Former testimony*. . . . In criminal cases, testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

TEX. R. EVID. 804(b). Thus,

> In order for former testimony to be admissible a three prong test must be satisfied. First, the declarant must be unavailable to testify at the latter proceeding. Second, the latter proceeding must include the same charges, parties and issues as the former proceeding. Third, the party against whom the testimony is being offered must have had an opportunity and similar motive at the former proceeding to develop the former testimony on direct, cross or redirect examination.

*Davis v. State*, 961 S.W.2d 156, 158 (Tex. Crim. App. 1998) (Baird, J., concurring) (citing *Bryan v. State*, 837 S.W.2d 637 (Tex. Crim. App. 1992), *abrogated on other grounds*, *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999)).

Lockridge argues that Horne was not rendered "unavailable" by his refusal to testify because he was present during the trial. However, "'[u]navailablity as a witness' includes situations in which the declarant: (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement." TEX. R. EVID. 804(a)(1). When a witness invokes "his Fifth Amendment privilege against self-incrimination . . . he bec[omes] 'unavailable' for purposes of Rule 804(a)(1)." *Davis*, 961 S.W.2d at 159 (Baird, J., concurring) (citing *Bryan*, 837 S.W.2d at 644); *see Del Carmen Hernandez v. State*, 273 S.W.3d 685, 687 (Tex. Crim. App. 2008); *Appling v. State*, 904 S.W.2d 912, 916 (Tex. App.—Corpus Christi 1995, pet. ref'd). Therefore, Horne was unavailable under

4

the meaning of Rule 804 because he invoked his Fifth Amendment privilege against self-incrimination.

Next, "as a general rule, when the parties, the charge, and the issues to be litigated are the same in the first and second trials, the two proceedings are necessarily the same and former testimony is admissible." *Martinez v. State*, 327 S.W.3d 727, 739 (Tex. Crim. App. 2010) (citing *Bryan*, 837 S.W.2d at 644). Horne's testimony was from Lockridge's previous trial that terminated in a mistrial. Thus, the parties, charges, and issues were necessarily the same. Finally, the record of Horne's testimony established that Lockridge had an opportunity and similar motive to cross-examine Horne in the previous trial.

We find no error in the trial court's admission of Horne's testimony. *See* TEX. R. EVID. 804. Accordingly, we overrule this point of error.

*(2) Sufficient Evidence Supports Lockridge's Conviction*

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found beyond a reasonable doubt the essential elements of murder. *Brooks v. State*,[2] 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

---

[2]Pursuant to *Brooks*, we will not address Lockridge's factual sufficiency arguments.

facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). In conducting a legal sufficiency review, we must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Shaw v. State*, 122 S.W.3d 358, 364 (Tex. App.—Texarkana 2003, no pet.) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. Here, Lockridge committed the offense of murder if he intentionally or knowingly caused Muckleroy's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

Muckleroy was a drug dealer who was gunned down in his own residence, allegedly by Lockridge, after a drug deal took an unexpected turn. Lockridge's longtime friend, Monda Harris, testified that Lockridge was commonly known to others by his street name, "Trigger." According to Harris, Lockridge visited her home at 917 Douglas Street, September 23, 2009, at approximately 7:00 p.m. to borrow her two-door, blue Pontiac Grand Am for what Harris believed would be a "short trip and back." Instead, Harris would not see her car until the following morning after it had been used in the commission of a crime.

Barron, Muckleroy's girlfriend, lived in Muckleroy's residence with her children. After the children were in their room asleep, Barron saw Horne drive up to the Muckleroy residence in

6

a black Cadillac and engage in conversation with Muckleroy outside the residence at 1:00 or 2:00 a.m. After Horne left, Barron remembered that Muckleroy received a telephone call at 3:00 a.m. which led to a heated discussion. Muckleroy warned Barron to go to the back room of the house because he was expecting Horne's return.

Barron testified that Horne returned and was speaking with Muckleroy in the kitchen when she heard a third party walk in.[3] Muckleroy told the third party that he just needed to speak with Horne. Both Horne and the third party commanded Muckleroy "to get down," adding, "You know what time it is." Barron immediately understood this to be a serious threat. She "grabbed [her] kids and . . . hid in the closet." From the closet, she could hear the men asking Muckleroy, "N****r, where the money at, where the money at? Where the dope?" Muckleroy assured them that they had everything and begged for his life. The third party said, "[Horne], give me the gun. I'm about to kill this n****r because he's lying." Muckleroy pleaded, "Trigger, don't kill me, please don't kill me. It don't have to be like this." Barron heard three gunshots and an instruction from the third party for Horne to "clean this s**t up." Based on Muckleroy's pleas, Barron identified the third party as "Trigger."

Barron remained hidden in the closet until she "looked though the crack and [saw] the house [wa]s on fire." After waiting for Horne and "Trigger" to leave, Barron jumped out of the window with her children to get to safety. She testified, "When I first come out, I saw two

---

[3]Barron could not see the events unfold from her position in the back room of the house. However, she testified that she knew Horne's voice and identified him as one of the perpetrators.

shadowy—shadowy figures in the garage, going through the car."[4] Barron and her children ran to the home of an acquaintance.

Neighbor Lee Benton testified that, when he woke up at 5:00 a.m. and "pulled the curtain back," he "saw a car with the brake lights on" parked at Muckleroy's house at 1215 Chappell. Later, Benton's daily morning routine was interrupted when he "heard a swooshing sound and got up, looked out the window again, saw flames" leaping from Muckleroy's residence and "immediately called 911." He noticed that the car was no longer visible. Brandon Thomas, another neighbor, spotted a "dark-colored" Pontiac Grand Am parked on the sidewalk by Muckleroy's house that morning. The car's lights were on, and Thomas saw a silhouette of a person behind the wheel.

Shametria Howard woke up that morning to an abrupt knocking at her window. Howard opened the door to a hysterical Barron who "rushed in . . . with her kids" and informed Howard that Muckleroy had been shot by "Bull[5] and Trigger." They went to relay the news to Muckleroy's cousin and best friend, Kelvin Smith.[6] Smith drove to the house, but found it engulfed in flames and surrounded by law enforcement.

---

[4]When she first spoke to the Longview Police Department, Barron told them she had seen Horne and was fifty percent certain she had seen Lockridge, at the scene of the incident. At Horne's trial for Muckleroy's murder, Barron testified that she could not see well and was not certain about her previous identification. She also testified that the car she saw "sitting outside by a mailbox" was a black Cadillac. Barron has been legally blind since she was three years old.

[5]Howard knew that Horne was "Bull," but did not know Lockridge at the time of the incident.

[6]Smith testified that he knew of another person nicknamed "Trigger" that was friends with Horne. Roderick George claimed his rapper stage name was "Trigga T." George testified that he was not friends with Horne and denied any part in Muckleroy's murder. He claimed that he did not know Lockridge at all. Harris also said she had never seen Lockridge and Horne together, did not know George, and there are more people she knows that have the nickname "Trigger." Lieutenant William Jennings testified that George was booked in jail on September 22, 2009.

8

Meanwhile, the perpetrators had driven away. Harris testified that she was upset when Horne returned alone at 6:00 a.m. with the car borrowed by Lockridge and asked for a ride back to Lockridge's house. Horne explained that Lockridge "was messed up from the night before" after ingesting "a mixture of drugs." Harris drove Horne to Lockridge's house and found Lockridge arguing with his wife outside.

Horne's cousin, Shatoya Davis, testified that she found Horne on her porch that morning. She went inside to get dressed, came back outside, and found Lockridge on the porch as well. Davis testified that Horne told her that a drug deal had gone bad and that he had killed Muckleroy. Lockridge witnessed Horne's confession to Davis and appeared "[j]ust agitated, nervous-like. He was mumbling he has to get to Dallas."

Investigator Jimmy Purcell testified that the fire "started in the kitchen-living room area." Muckleroy's burned body was located "in the kitchen" beside a nine millimeter bullet. Dr. Tommy J. Brown testified that Muckleroy was "extremely charred from the top of his head, all the way down to his feet." However, Brown concluded that Muckleroy died of "a gunshot wound of his right lateral neck that went from right to left, across the back of his throat, and out the left side of his neck."

Detective Eric Hewitt testified that Lockridge turned himself in for arson. It was during his interview with Hewitt that officers learned that the car used during the crime belonged to Harris. Lockridge also told Hewitt that he was dropped off at his home by Horne, "Sandy," and "Gangster." Lockridge claimed that, although he was not at the scene of the murder, he had heard that "Gangster" had set fire to the curtains in the kitchen.

9

Detective Chris Taylor's[7] search of Harris' vehicle uncovered Muckleroy's blood on the passenger floor mat. Taylor collected Lockridge's clothing from the jail and, although he discovered the presence of blood using Bluestar technology, there was not enough blood to identify its source.

Lockridge took the stand and denied involvement in Muckleroy's murder. On the evening in question, Lockridge claimed that he was dropped off by his wife at Horne's apartment so they could play video games, listen to music, smoke marihuana and dip, and ingest ecstasy and vodka. Afterwards, Lockridge went to borrow Harris' vehicle. Lockridge, Horne, and Davis then came up with the idea to make fake drugs so that Davis could sell them. After unsuccessful attempts at passing off fake drugs, Lockridge testified that he began getting calls from his wife inquiring about the hour when he would return home. Lockridge claimed that he went home before Muckleroy's murder.

Lockridge also confirmed that Harris' vehicle was returned by Horne alone. He claimed that he left his house with Horne on foot "when Monda dropped Brandon Horne off" and was later picked up by Davis. He claimed that Horne started washing his clothes at Davis' house. Lockridge received a note in jail from Horne which stated, "Check this: We both did some f***ed up s**t cuz, but I look at it as a battle for survival." According to Lockridge, Horne was complaining that Lockridge had accused him of the murder while Horne was accusing Lockridge of the same act."

---

[7]Detective Dan Reigstad testified that he found no fingerprints that matched those of Lockridge.

Lockridge's sister-in-law, Nakeisha Deckard, corroborated Lockridge's story that he was at home at "[s]omewhere around 5:45" a.m. However, she testified that she did not notice any symptoms of impairment that suggested Lockridge had recently been under the influence of drugs.

Lockridge's wife, Christyan, testified that Lockridge returned home "between 2:30 and 3:30,"[8] that they engaged in an argument, and that they then went to sleep. There were minor inconsistencies between Christyan's and Lockridge's testimony, however. Lockridge testified that he slept on the couch as a result of the argument, whereas Christyan initially stated he slept in the bed. Whereas Lockridge testified he smelled of marihuana, which prompted the argument between the two, Christyan denied that Lockridge appeared under the influence or smelled of any drug. Whereas Lockridge claimed he answered a telephone call from Horne around 6:39 a.m., Christyan testified she had answered the call instead. Lockridge did not return home after leaving with Horne to go to Davis' house that morning. Instead, he went to Dallas for several days before he was brought back by Christyan's mother.

After Horne's election not to testify at trial, Horne's testimony from a previous trial was read to the jury. From the reading of the transcript, it was garnered from Horne's testimony that Lockridge's nickname was "Trigger,"[9] that they knew each other "from the streets," and that they were with each other on the morning of September 23, 2009. Horne testified that he called Muckleroy that night because "Trigger came to my house and asked me to call for him." Horne

---

[8]Helen Jackson, Christyan's mother, also testified that Lockridge was at home before 4:30 a.m.

[9]Horne clarified that he was not friends with any other people nicknamed "Trigger."

testified that Lockridge went with him to Muckleroy's house at 2:00 a.m. the following morning in Harris' vehicle. He testified that both he and Lockridge had a conversation with Muckleroy inside of his living room and left after Trigger acquired crack cocaine. Horne next said, "I ended up calling [Muckleroy] back when Trigger" appeared at Horne's house between 4:00 and 4:30 a.m. Horne and Lockridge drove back to Muckleroy's home. Horne claimed that he remained outside while Lockridge entered the home until he saw Lockridge and Muckleroy "wrestling over something." Claiming he could not get past the locked gate, Horne testified that he was still outside when he heard gunshots and then ran. According to Horne, Lockridge drove up while he was running, Horne got in the car, they drove to Lockridge's house, and Horne returned the car to Harris alone.

After hearing the evidence, the jury convicted Lockridge of Muckleroy's murder. Lockridge complains that the evidence is legally insufficient because "[o]ther than the blood of the victim found on the floor mate [sic] there was no evidence that connected the Appellant to any of the crime scene." Identity is the issue in this case.

The jury heard from both the State and the defense that Horne and Lockridge were together on the night of the incident and that Lockridge had ingested drugs. Harris and Lockridge both confirmed that Lockridge had borrowed Harris' car, and Muckleroy's blood was found on the passenger-side floor board, suggesting that more than one person participated in the crime. Barron heard the incident and heard Muckleroy beg "Trigger" for his life. Contrary to Lockridge's assertion, this evidence placed him at the scene of the crime. When Barron fled Muckleroy's home, she saw only two shadowy figures at the residence. Several witnesses

12

testified that Lockridge's nickname was "Trigger" and that Horne and "Trigger" were known to be friends. Harris testified that, when Horne dropped off her car, he explained that Lockridge "was messed up from the night before" after ingesting "a mixture of drugs," indicating again that the two had been together.

There were approximately forty-one telephone calls between Lockridge and Horne during the timeframe in question. Davis testified to Horne's statements to her that a drug deal had gone bad and that he had killed Muckleroy. When Horne confessed this information to Davis, Davis saw that Lockridge appeared "[j]ust agitated, nervous-like. He was mumbling he has to get to Dallas." After Horne's statement to Davis, Lockridge went to Dallas and did not return home for a few days.

The jury saw a note that Horne wrote and somehow delivered to Lockridge in jail claiming that they had both done "some f***ed up s**t." The note also contained the following language penned by Horne:

> Cuz I pray you get off this s**t cuz this s**t here for tha birds. I been in here d**n near 2 years & they can't tell me s**t but I need to testify. My n***a they don't got you & I be d**n if I let you fry. They gone probably try & make me come to your trial but if you see me walk threw dem doors just know I gottcha. I got love for you cuz & I'm glad you had [unreadable]. I ain't gone have no parts of you getting convicted my n***a & dat's on everything! If dey free you, dey free us.

Finally, the transcript of Horne's prior testimony plainly identified Lockridge as the person who shot Muckleroy.

The evidence was legally sufficient to establish beyond a reasonable doubt that Lockridge intentionally or knowingly caused Muckleroy's death. This point of error is overruled.

13

*(3)      No Error Was Preserved Regarding the Admission of  Lockridge's Prior Testimony*

Lockridge objected to the introduction of his testimony from his previous trial on the ground that it constituted hearsay.[10]  The substance of Lockridge's argument in his briefing complains only that the declaration of mistrial rendered the prior proceeding "nugatory," and suggests that the transcript's admission was error on this basis.  An appellant's argument on appeal "must comport with the objection made at trial."  *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).  The argument relating to "the proceedings occurring before the granting of a mistrial becom[ing] legally ineffective" was not preserved for appellate review. TEX. R. APP. P. 33.1.[11]

We overrule this point of error.

*(4)      Lack of an Accomplice-Witness Instruction Was Not Egregiously Harmful*

Lockridge argues that he was entitled to an accomplice-witness instruction to the jury because Horne's testimony from a previous trial was admitted against him.  Our review of alleged jury charge error involves a two-step process.  *Abdnor v. State*, 871 S.W.2d 726, 731

---

[10]In his previous trial, Lockridge denied that he ever talked to Muckleroy and claimed that Horne confessed to him that he stabbed and shot Muckleroy alone.

[11]Even though the title of the point of error complains that the trial court erred in admitting Lockridge's testimony from the previous trial on the ground that he would be unavailable, there is no briefing to support the assertion. Thus, the brief is inadequate on this point.  In any event, the record reflects that the trial court also made its decision to admit the testimony because "a criminal defendant's own statements, when being offered against him, are not hearsay." *Trevino*, 991 S.W.2d at 853 (citing TEX. R. EVID. 801(e)(2)).

Further, after the substance of the transcript was read to the jury, Lockridge waived his Fifth Amendment privilege, took the stand, and testified in a fashion similar to the testimony he gave in his prior trial.  "If a defendant objects to the admission of evidence but the same evidence is subsequently introduced from another source without objection, the defendant waives his earlier objection." *Bryant v. State*, 282 S.W.3d 156, 165 (Tex. App.—Texarkana 2009, pet. ref'd) (quoting *Massey v. State*, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996)).  Here, the evidence Lockridge complained of was introduced subsequently by him.  Thus, any complaint regarding the admission of the testimony was waived.

(Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Initially, we determine whether an error occurred and then "determine whether sufficient harm resulted from the error to require reversal." *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

There is no dispute that Horne was an accomplice in Muckleroy's murder since he had previously been convicted for the same crime.[12] Thus, Lockridge was entitled to an accomplice-witness instruction to the effect that a conviction is not valid without corroboration of an accomplice's testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). Thus, a trial court must instruct the jury sua sponte in accordance with Article 38.14 where applicable. *Freeman v. State*, 352 S.W.3d 77, 82–83 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding trial judge erred in failing to instruct jury sua sponte that testimony of accomplice was required to be corroborated in accordance with Article 38.14). The State concedes that the trial court's failure to do so was error.

Next, we discuss whether the failure to include the accomplice-witness instruction harmed Lockridge. The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error.

---

[12]A person who has been indicted for the same or a lesser-included offense is an accomplice as a matter of law. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).

*Abdnor*, 871 S.W.2d at 732. "Where the evidence clearly shows a witness is an accomplice as a matter of law, the trial court must so instruct the jury, but if the appellant fails to object to the omission of the instruction, as in [Lockridge's] case, he or she must prove egregious harm to prevail on appeal." *Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd); *see Ngo*, 175 S.W.3d at 743–44 (citing *Almanza*, 686 S.W.2d at 171); *see also Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004). In answering this question, we "must take the entire record into account, as in any *Almanza* analysis." *Cassanova v. State*, 383 S.W.3d 530, 534 (Tex. Crim. App. 2012).

The omission of an accomplice-witness instruction is generally not egregiously harmful unless the corroborating (nonaccomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Hall*, 161 S.W.3d at 150 (quoting *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)). "This is said to be so because the instruction merely informs the jury that it cannot use the testimony of the accomplice or the informant unless it is first determined that other evidence exists connecting the defendant to the offense." *Simmons v. State*, 205 S.W.3d 65, 77 (Tex. App.—Fort Worth 2006, no pet.). In conducting this analysis, we exclude the testimony of the accomplice witness and examine the remaining evidence to determine whether it tends to connect the defendant to the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The tends-to-connect standard does not present a high threshold as the "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.*; *see Cantelon v. State*, 85 S.W.3d

16

457, 461 (Tex. App.—Austin 2002, no pet.). "Rather, the evidence must simply link the accused in some way to the commission of the crime." *Id.*

> No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. Nor must the non-accomplice evidence directly link the accused to the commission of the offense. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Dowhitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted).

Here, Lockridge claims, "There is no corroborating evidence found in the record to support a finding of guilt." Horne's testimony pointed to Lockridge as the person who shot Muckleroy.

There was ample corroborating evidence. Lockridge and Harris testified that Lockridge borrowed Harris' vehicle. Testimony from Lockridge and Christyan established that Lockridge was with his friend Horne on the night before the murder. Barron testified that she heard Horne and a third party called "Trigger" enter Muckleroy's home in the early morning hours on the day of his murder. Barron said that Muckleroy begged for "Trigger" to spare his life just before she heard three gunshots. "Trigger" was Lockridge's nickname. Forty-one telephone calls were made between Horne and Lockridge during the timeframe in question. After the incident, Davis testified that Lockridge and Horne came to her house, that Horne confessed that a drug deal had gone bad and that he had killed Muckleroy, and that Lockridge's behavior after Horne made the statement indicated that he was considering a quick exit to Dallas. Christyan and her mother

17

testified that Lockridge went to Dallas, did not return for a few days, and was brought back by them.  Detective Hewitt testified that Lockridge turned himself in for arson after he was retrieved from Dallas.  It was Muckleroy's house that was burned.  This act also placed Lockridge at the scene of the crime.

Because ample evidence, other than Horne's testimony, tended to connect Lockridge to the commission of the crime, Lockridge was not egregiously harmed by the trial court's failure to include the accomplice-witness instruction.

*(5)      Counsel's Failure To Request an Accomplice-Witness Instruction Was Not Prejudicial*

Lockridge complains that his trial counsel was ineffective in failing to request the accomplice-witness instruction, placing him "in a position of having to meet a greater burden on the failure to so charge on appeal."  We apply the two-pronged *Strickland* test handed down by the United States Supreme Court to determine whether Lockridge received ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984); *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009).  Failure to satisfy either prong of the *Strickland* test is fatal to such a claim.  *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006).

First, Lockridge must show that counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms.  *Strickland*, 466 U.S. at 687–88.  Where a witness is an accomplice as a matter of law, counsel's failure to request an accomplice-witness instruction constitutes deficient performance.  *Hall*, 161 S.W.3d at 152 (citing *Henson v. State*, 915 S.W.2d 186, 197 (Tex. App.—Corpus Christi 1996, no pet.)).  The first *Strickland* prong is met.

The second prong, however, fails. Lockridge must next show that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome, meaning that counsel's errors were so serious as to deprive Lockridge of a fair trial whose result is reliable. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009). In this context, the analysis will turn on "whether there was a substantial amount of non-accomplice evidence and whether the record reveals any rational basis on which the jury could have doubted or disregarded that evidence." *Davis v. State*, 278 S.W.3d 346, 353 (Tex. Crim. App. 2009).

As recited above, the jailhouse letter, telephone records, and testimony from Harris, Barron, Davis, Christyan, Jackson, Hewitt, and even Lockridge himself tends to connect Lockridge to the commission of the offense. We find that this nonaccomplice evidence was substantial. In his brief, Lockridge fails to point to any rational basis on which the jury could have doubted or disregarded this evidence, and we find none. Accordingly, Lockridge cannot meet the second *Strickland* prong requiring the demonstration of a reasonable probability that the result of the proceeding would have been different. We overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     May 14, 2013
Date Decided:       May 17, 2013

Do Not Publish