

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

KATHERINE O'HAVER,  )
                    )
          Appellant,  )
                    )
v.                  )          WD86040
                    )
3M COMPANY,         )          Opinion filed:  June 18, 2024
                    )
          Respondent.  )

**APPEAL FROM THE CIRCUIT COURT OF
JACKSON COUNTY, MISSOURI
THE HONORABLE JENNIFER M. PHILLIPS, JUDGE**

Division Two:  Thomas N. Chapman, Presiding Judge,
Karen King Mitchell, Judge and W. Douglas Thomson, Judge

Katherine O'Haver appeals from the trial court's judgment following a jury trial where a jury found in favor of Defendant 3M Company ("3M") on her claims for negligent and defective design, manufacturing, and marketing of 3M's Bair Hugger patient warming system ("Bair Hugger").  O'Haver brings nine points on appeal.  Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On November 29, 2016, O'Haver underwent a left total knee arthroplasty at Centerpoint Medical Center.  O'Haver was discharged from the hospital on

December 9, 2016 without complication and began physical therapy. Her staples were removed on December 14 without any signs of infection. At some point between December 14 and December 19, O'Haver's surgical site re-opened and began draining and bleeding. On December 19, the wound was re-sutured and she resumed physical therapy. Between December 28 and 31, O'Haver began exhibiting signs of an infection. O'Haver developed a periprosthetic joint infection ("PJI") and underwent a second surgery on January 2, 2017.

O'Haver brought suit against 3M, the manufacturer of the Bair Hugger medical device, alleging negligent and defective design, manufacturing, and marketing of the Bair Hugger.[1] The Bair Hugger is a warming and blowing unit connected by a hose to a disposable blanket that distributes heated air directly onto a surgical patient through perforated holes. O'Haver alleged that the Bair Hugger caused her PJI by contaminating her, the sterile field, surgical instruments, and medical personnel by blowing contaminated air. O'Haver also alleged that the Bair Hugger caused her PJI by disrupting operating room airflow.

The trial court conducted a jury trial from September 27, 2022 through October 13, 2022. 3M posited at trial that O'Haver's skin bacteria and the re-opening of her surgical site caused her infection and that the Bair Hugger has never

---

[1] O'Haver's claims are similar to those brought in federal multidistrict litigation pending in the United States District Court of Minnesota. *See In re Bair Hugger Forced Warming Devices Prods. Liab. Litig.*, MDL No. 2666.

been shown to contaminate the surgical site or blow contaminated air.  3M Expert Witness A testified regarding a computational fluid dynamics (CFD) study he had prepared, which addressed the impact of the Bair Hugger on the heat and air flow in an operating room; and which concluded that the Bair Hugger did not disrupt operating room airflow.  3M Expert Witness B testified regarding the impact of the Bair Hugger on surgical wound infection and concluded that he was not aware of any scientific evidence that suggested a causal relationship between the Bair Hugger and surgical site infections.

The jury returned a verdict in favor of 3M.  The trial court thereafter entered judgment in favor of 3M.  O'Haver filed an extensive motion for a new trial, which the trial court denied.  This appeal follows.

## STANDARD OF REVIEW

We review each of O'Haver's points for abuse of discretion. "On appellate review, the issue is not whether the evidence was admissible, it is whether the trial court abused its discretion in excluding the evidence." *Rock v. McHenry*, 115 S.W.3d 419, 420 (Mo. App. W.D. 2003).  "A trial court 'enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal.'" *Cox v. K.C. Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015) (quoting *Moore v. Ford Motor Co.*, 332 S.w.3d 749, 756 (Mo. banc 2011)).  The same is true when a trial court administers the rules of discovery. *See Hill v. Wallach*, 661 S.W.3d 786, 788 (Mo.

banc 2023) ("[C]ircuit courts 'have broad discretion in administering rules of discovery, which this Court will not disturb absent an abuse of discretion.'") (quoting *State ex rel. Delmar Gardens N. Operating, LLC v. Gaertner*, 239 S.W.3d 608, 610 (Mo. banc 2007)).

A trial court's "ruling constitutes an abuse of discretion when it is 'clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Cox*, 473 S.W.3d at 114 (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)). "By both statute and rule, an appellate court is not to reverse a judgment unless it believes the error committed by the trial court against the appellant materially affected the merits of the action." *Lewis v. Wahl*, 842 S.W.2d 82, 84-85 (Mo. banc 1992).

"If any ground exists for excluding the evidence, we will uphold the trial court's decision to exclude it." *Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310, 331 (Mo. App. W.D. 2000). "Therefore, we are not bound by either [the] trial court's reasons for refusing the evidence or the complaining party's objections to the admissibility of the evidence." *Id.*

## ANALYSIS

O'Haver brings nine points on appeal. Points I through V and Point VII concern various evidentiary objections during O'Haver's cross-examination of

4

3M's experts.[2]  Thus, we address Points I through V together, then address Point VII.  Next, we address Point VI, where O'Haver argues that the trial court erred in limiting her cross-examination of 3M Expert Witness M due to 3M Expert Witness M's scheduling conflicts.  Then, we address Points VIII and IX, which concern the results of an internal study conducted by 3M.

**POINTS I THROUGH V**

Each of O'Haver's Points I through V address the trial court's rulings that limited O'Haver's cross-examination of 3M's expert witnesses - particularly the trial court's refusal to allow further cross-examination regarding various exhibits after 3M's experts had acknowledged they had not considered the exhibits when formulating their opinions.

---

[2] Each of O'Haver's Points I through V and VII challenge distinct trial court rulings relating to O'Haver's attempted introduction of various evidence during her cross-examination of 3M's expert witnesses.  None of these points allege a blanket exclusion of certain topics for cross-examination by the trial court.  As such, we treat each of O'Haver's points as challenging the trial court's rulings excluding certain evidence or certain questions relating to such evidence.

As part of each argument, O'Haver attempts to frame these points as the trial court improperly limiting the scope of her cross-examination of 3M's expert witnesses.  While we agree O'Haver has the "absolute" right to cross-examine 3M's expert witnesses, the right to cross-examination is not limitless.  See Section 491.070 ("A party...shall be entitled to cross-examine [an adverse] witness.").  "It is well established that the extent and scope of cross-examination in a civil action is within the discretion of the trial court and 'will not be disturbed unless an abuse of discretion is clearly shown.'" *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 869 (Mo. banc 1993) (quoting *Stafford v. Lyon*, 413 S.W.2d 495, 498 (Mo. 1967)).  Such is "especially true for cross-examination of expert witnesses." *Id.*

In Point I, O'Haver argues the trial court erred in sustaining 3M's objection to further cross-examination of 3M Expert Witness A, regarding Exhibit 2251. In his direct testimony, 3M Expert Witness A cited a letter that had been published in the Journal of Hospital Infection (JHI Letter), which supported the conclusions in his CFD study - that the Bair Hugger did not appreciably disrupt operating room air flow. O'Haver cross-examined 3M Expert Witness A regarding his familiarity with Exhibit 2251, an email exchange between a 3M consultant and the author of the JHI Letter which O'Haver believes casts doubt on the credibility of the JHI letter. Expert Witness A indicated that no one had provided him Exhibit 2251, nor could he attest to its authenticity. The court sustained 3M's objection to the admission of, and any further cross-examination of 3M Expert Witness A in regard to, Exhibit 2251.

In Point II, O'Haver challenges the trial court's rulings denying her the opportunity to further cross-examine 3M Expert Witness B regarding Exhibits 134A and 1749A. 3M Expert Witness B testified regarding the impact of the Bair Hugger on surgical wound infection, and concluded that he was not aware of any scientific evidence that found a causal relationship between the Bair Hugger and surgical site infections. On direct examination 3M Expert Witness B acknowledged that the Bair Hugger elevated the number of particles in an operating room, but concluded that the increase in particles did not increase infection-causing bacteria. Exhibit 134A was an email exchange between 3M employees which queried

whether a bacterial study should be performed by 3M, and which included an email which indicated that the study should not be conducted in light of "the ongoing legal situation". Exhibit 1749A was an email exchange among 3M employees which discussed concern among surgeons about particulates (including bacteria) circulated by the Bair Hugger, and which suggested a purportedly independent source relied on by the defense (including 3M Expert Witness B) was not evidence-based and had been reviewed by 3M prior to its publication.[3] The court sustained 3M's objection to further cross-examination of 3M Expert Witness B after he indicated he had not considered said exhibits in formulating his conclusions.

In Point III, O'Haver alleges that, after 3M Expert A acknowledged he had no knowledge of the content of (and purported admissions in) the deposition of 3M's corporate representative, the trial court erred in preventing O'Haver from playing a portion of said video deposition in furtherance of his cross-examination of 3M Expert Witness A.

---

[3] O'Haver's second point violates Rule 84.04(d)(1)(A), which requires each point to identify the trial court ruling or action that is being challenged. "The point relied on is a central, indispensable element of an appellate brief because it defines a specific issue for this Court's review." *City of Harrisonville v. Mo. Dep't of Nat. Res.*, 681 S.W.3d 177, 180 (Mo. banc 2023) (citing *Lexow v. Boeing Co.*, 643 S.W.3d 501, 505 (Mo. banc 2022)). "A single point relied on that groups multiple, disparate claims is multifarious, does not comply with Rule 84.04, and generally preserves nothing for review." *Rouse v. Cuvelier*, 363 S.W.3d 406, 419 (Mo. App. W.D. 2012) (internal quotation omitted). Point II challenges two distinct evidentiary rulings by the trial court and is thus multifarious. As such, although we exercise our discretion to review O'Haver's second point, we would be well within our discretion to dismiss the second point on this basis. *See Stone v. Stone*, 450 S.W.3d 817, 820 (Mo. App. W.D. 2014).

In Point IV, O'Haver claims that the trial court erred in curtailing the cross-examination of 3M Expert Witness A regarding the content of Exhibit 1669, which was a separate, internal CFD study prepared by 3M. Despite this contention, O'Haver questioned 3M Expert Witness A extensively using Exhibit 1669, and 3M Expert Witness A testified that the boundary conditions in Exhibit 1669 were "very close" to the boundary conditions he calculated. 3M Expert Witness A testified that he did not recall receiving Exhibit 1669 and did not use it to determine the boundary conditions regarding the CFD study he conducted.

In Point V, O'Haver argues the trial court erred in sustaining 3M's objection to O'Haver's use of Exhibit 2204NA, which was a video exhibit that explained the "McGovern Study" (a retrospective study that purported to show increased infection rates when the Bair Hugger was used) to cross-examine 3M Expert Witness A. The "McGovern Study" itself (Exhibit 93), had been previously admitted into evidence, as had the related video (Exhibit 2204A). 3M Expert Witness A testified he had reviewed the "McGovern Study," but had not seen the video. O'Haver's Point IV challenges the trial court's sustaining 3M's objection to continued cross-examination of 3M Expert Witness A regarding the content of (and the playing of) the video.

With the exception of Exhibit 2251 at issue in Point I,[4] all of the exhibits at issue in Points II through V had been previously admitted at trial through other witnesses. In each instance addressed in Points I through V, the 3M expert witness testified that he had no knowledge of the various exhibits, and in each instance the court sustained 3M's objection to further cross-examination of the 3M's expert regarding said exhibits. O'Haver argues that she wanted to further cross-examine 3M's experts regarding said exhibits in order to call into question the credibility of each of 3M's experts, by showing that 3M's experts were provided cherry-picked information, which, in turn, skewed their conclusions to suit 3M's narrative.

The trial court granted 3M's objections, and each time cut short further cross-examination regarding the various exhibits addressed in Points I through V. Regarding Point I, O'Haver attempted to make a record regarding Exhibit 2251 the next day after 3M Expert Witness A had been excused but did not make a contemporaneous offer of proof of Exhibit 2251 (which had not been previously admitted) while 3M Expert Witness A was on the stand. Regarding Points II through V, O'Haver made no offers of proof whatsoever regarding the cross-examination she was denied.

---

[4] Exhibit 2251, addressed in Point I, was an email between two non-parties who did not testify at trial. Prior to the examination of 3M Expert Witness A, O'Haver had twice offered Exhibit 2251 into evidence, and in each instance the trial court had sustained 3M's objection to its admission.

"The admission of evidence is reviewed for prejudice, not mere error." *Westmoreland v. Midwest St. Louis LLC*, 623 S.W.3d 618, 638 (Mo. App. E.D. 2021) (citing *Teasdale & Assoc. v. Richmond Heights Church of God in Christ*, 373 S.W.3d 17, 24 (Mo. App. E.D. 2012)). "If an objection to the proffered evidence is sustained, the proponent must then make an offer of proof in order to preserve the record for appeal and to allow the trial court to consider further the claim of admissibility." *State v. Yole*, 136 S.W.3d 175, 178 (Mo. App. W.D. 2004). "When a party fails to make an offer of proof, nothing is preserved for appeal." *Calzaretta v. Willard*, 391 S.W.3d 488, 493 (Mo. App. S.D. 2013) (citing *Eckert v. Thole*, 857 S.W.2d 543, 546 (Mo. App. E.D. 1993)). "'Without an offer of proof, made on the record at trial, [this Court] cannot convict the trial court of error in failing to admit evidence[.]'" *Id.* (quoting *Eckert*, 857 S.W.2d at 546).

An offer of proof serves two purposes: to preserve a record for appellate review and to allow "the trial court to rule upon the propriety and admissibility of the evidence." *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). "In order to present and preserve an offer of proof, the questions must be propounded to a witness who is present and has taken the stand,", i.e. it must be timely. *Id.* "An offer of proof must demonstrate three things: '(1) what the evidence will be; (2) the purpose and object of the evidence; and (3) each fact essential to establishing the admissibility of the evidence.'" *State v. Ross*,

292 S.W.3d 521, 526 (Mo. App. W.D. 2009) (quoting *State v. Hirt*, 16 S.W.3d 628, 633 (Mo. App. W.D. 2000)).

O'Haver argues that an offer of proof is unnecessary in this case because the trial court was clear in its ruling and an offer of proof would not have changed the trial court's rulings. Further, O'Haver argues that an offer of proof is only meant to establish the relevance of the evidence, and in this case, the relevance of each piece of evidence was self-evident. O'Haver's argument ignores another purpose of an offer of proof: to create a record for this Court to review, which, in turn allows us to determine whether she was prejudiced by any of the purported errors. Put another way, if we have no record of how the expert witnesses would have testified had the cross-examination proceeded, we have no idea the impact that testimony would have had on the credibility of the witness, and, by extension, whether it would have had any impact on the outcome of the trial

We need not address the propriety of the trial court's rulings which sustained the objections to further cross-examination regarding the exhibits, as we have no record to determine whether O'Haver was prejudiced by those rulings. In short, in failing to make an offer of proof regarding the cross-examination that

O'Haver alleges she was denied, O'Haver fails to demonstrate how, or whether, she was prejudiced by the trial court's rulings.  Points I through V are denied.[5]

**POINT VII**

In Point VII, O'Haver argues that the trial court erred in sustaining 3M's objection to O'Haver's cross-examination of 3M Expert Witness B about whether the Bair Hugger caused her infection on the grounds that it invaded the province of the jury.

Point VII addresses the following line of questioning between O'Haver and 3M Expert Witness B at trial:

> Q:    Now to wrap this up.  You cannot say that the Bair Hugger did not cause Ms. O'Haver's deep joint injection.
>
> A:    Yes, I agree.  I said that before.

---

[5] In each of her nine points, O'Haver requested plain error review in the event we determine, as we do for Points I through V, that she failed to properly preserve her point. O'Haver does not employ a plain error analysis or explain – beyond a single sentence requesting it – why plain error review is warranted in this case.  Plain error review is discretionary. *See* Rule 84.13(c).  "'Plain error review requires a two-prong analysis to determine (1) whether there was an error that is evident, obvious, and clear; and (2) whether a manifest injustice or miscarriage of justice occurred as a result of that error.'" *A.J.L.G. v. Juvenile Officer*, 679 S.W.3d 556, 560 (Mo. App. W.D. 2023) (quoting *In re D.E.D.*, 653 S.W.3d 427, 434 (Mo. App. W.D. 2022)).  "[P]lain error review is rarely granted in civil cases." *Williams v. Mercy Clinic Springfield Cmtys.*, 568 S.W.3d 396, 412 (Mo. banc 2019).  "[T]o reverse for plain error in a civil case, the injustice must be so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Id.* (internal quotes and citation omitted).  We decline to apply plain error review to any of O'Haver's points where we determine she did not preserve her point for appeal.  As we explain throughout this opinion, none of O'Haver's points are meritorious and even if they were, none of the alleged errors materially affect the outcome of the trial.  O'Haver is not entitled to plain error review.

Q:      You [can't] tell this jury that the Bair Hugger didn't do it, correct?

A:      It is not possible to say it did not and it's not possible to say that it did.

Q:      Therefore, you cannot rule out, you cannot exclude the Bair Hugger as a potential cause of this woman's deep joint infection, true?

A:      There's a hypothetical risk.

Q:      You cannot exclude it as a potential cause of her deep joint infection, true, yes or no?

A:      Yes.   I can conclude it as a hypothetical risk of her joint infection.

Q:      Yes or no, you cannot exclude it as a potential cause of her infection?

A:      I cannot exclude it.

Q:      Therefore, it is a potential cause for this jury to consider in determining whether it contributed to her deep joint infection, true?

At this point, 3M's counsel objected that the question invaded the province of the jury.  After a brief bench conference, the trial court sustained 3M's objection. O'Haver's counsel then continued the cross-examination by asking, "[Y]ou cannot exclude the Bair Hugger as a potential cause of Ms. O'Haver's deep joint infection?" Once again, 3M's Expert Witness B responded, "I cannot exclude it."

O'Haver argues that the trial court's ruling unfairly prejudiced her by leaving "the jury with the false impression that the Bair Hugger *was not* a potential cause it could consider concerning O'Haver's deep joint infection, the ultimate issue in

13

this case." (emphasis in original). O'Haver also argues that the trial court erred in sustaining 3M's objection because an expert is permitted to testify as to their opinion relating to an ultimate issue.

The full extent of 3M Expert Witness B's testimony contradicts O'Haver's argument. The jury heard 3M Expert Witness B testify multiple times that he could not exclude the Bair Hugger as a potential cause of O'Haver's deep joint infection. O'Haver asked 3M Expert Witness B at least six times whether he could exclude the Bair Hugger as a potential cause of O'Haver's infection, and each time he testified that he could not exclude it. Accordingly, even if it were error for the trial court to sustain 3M's objection, O'Haver was certainly not prejudiced by the exclusion of one question when the jury was allowed to hear 3M Expert Witness B's answers to repeated similar questions.

Even if the circuit court abused its discretion in sustaining 3M's objection to O'Haver's question to 3M Expert Witness B, O'Haver suffered no prejudice because the jury heard 3M Expert Witness B testify several times that he could not exclude the Bair Hugger as a potential cause of O'Haver's infection. Point VII is denied.

**POINT VI**

In Point VI, O'Haver argues that the trial court erred in limiting her cross-examination of 3M's orthopedic surgery expert, 3M Expert Witness M (also "Expert Witness M"), due to his scheduling limitations. O'Haver argues that the trial court's limitation was unreasonable and prejudiced her.

14

On September 21, one week before trial,[6] the trial court conducted a phone conference with the parties. 3M requested that Expert Witness M be allowed to testify remotely, and the trial court granted such request over O'Haver's objection.[7] 3M stated that Expert Witness M was originally available to testify October 12 and 13 but because several defendants and claims were dismissed, those dates no longer fit with the anticipated trial schedule. 3M indicated that Expert Witness M had limited availability during trial due to religious obligations and a mandatory professional conference. 3M stated that Expert Witness M was also available October 3, but O'Haver was not likely to have closed her case-in-chief at that point. 3M then proposed either Expert Witness M be available to testify remotely the morning of October 7, or alternatively he would be available for a trial deposition over the weekend. The expert's testimony was set for October 7th. No trial deposition was taken over the intervening weekend.

During 3M Expert Witness M's testimony, the trial court kept time to track how long each party had questioned him, excluding objections. The trial court noted at the end of Expert Witness M's testimony that O'Haver received 6 minutes more to cross-examine Expert Witness M than 3M received to direct examine him.

---

[6] Although this was the first time this was discussed on the record, it appears this may not be the first time this matter had been addressed. During discussions *on* the record, it appears the scheduling limitation issue had previously been discussed in a conference *off* the record.

[7] O'Haver does not challenge the trial court's ruling regarding Expert Witness M's remote testimony on appeal.

After his testimony concluded, the trial court stated during a bench conference:

> The other piece of it that I will say is that I don't view this as being penalized although you may and that's obviously your perspective and I understand that. But the fact of the matter is that representations are made to the Court that the plaintiff's evidence would take four days. Plaintiff was given five and half days to present evidence. There was no objection that was made during any of the defendant's cross-examination.
>
> And what I've done is I've tried to then make it equal. I'm not allowing plaintiff to have – I'm sorry, defendant to have a hundred-minute direct examination with half of that being cross-examination. I'm trying to navigate this and ensure that despite us running behind schedule as well as taking into consideration the scheduling limitations of the witnesses that it is equal time for direct and for cross-examination.
>
> And based upon my decisions today, the defendant was not allowed any type of redirect. If the defendant wants to make [Expert Witness M] available on Tuesday morning for additional testimony. But as far as I'm concerned there was an equal amount. And, in fact, I think plaintiff got six more minutes as it relates to the cross-examination of [Expert Witness M]. So that's all I have to say on the matter.

The trial court did not abuse its discretion in accounting for 3M Expert Witness M's scheduling limitations at trial.

O'Haver points us to *Hyde v. Butsch*, 861 S.W.2d 819 (Mo. App. E.D. 1993) as instructive in this case. In *Hyde*, the trial court granted the plaintiff's motion for a new trial after determining that it abused its discretion in limiting plaintiff's cross-examination of a defense rebuttal expert. *Id.* at 820. The rebuttal expert began testifying one afternoon and the defense questioned him for approximately one hour and forty-five minutes. *Id.* at 821. The plaintiff was allowed fifty minutes

to cross-examine the rebuttal expert before the trial court stopped questioning because a jury member reported that he could not stay beyond five o'clock. *Id.* The rebuttal expert stated it would be an extreme hardship for him to return to continue testifying, and the trial court excused him over the plaintiff's objection. *Id.* The plaintiff then told the court "of the specific areas that she had been unable to question" the rebuttal expert. *Id.* The rebuttal expert had been deposed prior to trial, but some of the topics on which the plaintiff intended to question the rebuttal witness were not included in his deposition testimony. *Id.* The Eastern District affirmed the trial court order granting plaintiff a new trial. *Id.* The Court found that the trial court's dismissal of the rebuttal expert was an abuse of discretion and prevented the plaintiff from fully cross-examining the expert as to "his skill, qualifications, credibility and the value and accuracy of his opinions." *Id.*

The circumstances surrounding 3M Expert Witness M's cross-examination in this case are different from those in *Hyde*. Most notably, O'Haver knew well in advance of trial that Expert Witness M's availability to testify at trial was limited to the morning of October 7, 2022, in contrast to *Hyde* where the juror's sudden announcement that departure was necessary occurred during trial, on the day of the witness's testimony. During the pre-trial conference of September 26, 3M also offered up Expert Witness M for a trial deposition over the weekend, but O'Haver declined the offer. Therefore, O'Haver had ample time, and an alternative, to prepare her cross-examination with those time limitations in mind. Further, in

*Hyde*, the plaintiff received less than half of the time to cross-examine the rebuttal expert as the defendant did to direct him. In this case, the trial court noted that O'Haver received more time to question 3M Expert Witness M than that of 3M. The rebuttal expert in *Hyde* had only been disclosed 11 days prior to trial and deposed only four days before trial. In contrast, Expert Witness has been an expert on behalf of 3M in Bair Hugger litigation since 2016 and had been deposed prior to trial.

Additionally, unlike in *Hyde*, O'Haver never argues that her cross-examination of 3M Expert Witness M and his deposition testimony did not cover all of the topics she wanted to cover. Instead, she argues that had she "been granted a reasonable amount of time to cross-examine [Expert Witness M], she would have attempted to impeach his credibility and the accuracy of his testimony using every one of [3M's document] exhibits and numerous 3M admissions that directly contradicted his opinions." (App. Brief at 58). O'Haver does not argue, like the plaintiff did in *Hyde*, that she was unable to question 3M Expert Witness M about certain topics or that his deposition testimony did not cover all of the topics she wished to discuss. Further, O'Haver did not attempt to read Expert Witness M's deposition testimony into the record.[8]

---

[8] Nor is his deposition testimony in the record on appeal for our review.

18

The trial court allowed both parties nearly equal time to question 3M's Expert Witness M. O'Haver had sufficient notice ahead of trial to ensure – either through live testimony or deposition – that the jury would hear all of O'Haver's cross-examination of 3M Expert Witness M. The trial court did not abuse its discretion. Point VI is denied.

## POINTS VIII AND IX – 3M's ASSERTION OF PRIVILEGE

In Point VIII, O'Haver argues that the trial court erred in sustaining 3M's objection to producing the results of 3M's internal CFD study after finding it was protected by the work product privilege because 3M waived the work product privilege and because O'Haver has a substantial need for the work product and cannot obtain its equivalent without undue hardship.

At the direction of 3M's in-house counsel, 3M conducted internal litigation testing of the Bair Hugger in 2015. 3M's in-house counsel and outside counsel were the only individuals to receive the results of the internal testing. During discovery, O'Haver sought the results of 3M's internal study, to which 3M asserted the documents were protected by the work product and attorney-client privileges. The trial court, at O'Haver's request, appointed a special master to determine whether the results of 3M's internal study were indeed privileged. After conducting an in-camera review of the claimed privileged documents, the special master entered an order stating that 3M's internal CFD testing "have been

appropriately withheld and are not to be disclosed."  O'Haver objected to the special master's order, and the trial court overruled her objections.

Although the conclusions of 3M's internal CFD testing were not disclosed to O'Haver, 3M disclosed the underlying data to O'Haver, which was admitted into evidence at trial.  One of O'Haver's experts also conducted his own CFD testing and testified at trial.

"The work product doctrine is a defense to pretrial discovery." *State ex rel. Malashock v. Jamison*, 502 S.W.3d 618, 619 (Mo. banc 2016).  "The work product doctrine precludes discovery of the mental impressions, conclusions, opinions, or legal theories, both tangible and intangible, created or commissioned by counsel in preparation for possible litigation." *Id.* at 620 (citing *State ex rel. Ford Motor Co. v. Westbrooke*, 151 S.W.3d 364, 367 (Mo. banc 2004)).

Rule 56.01(b)(5) permits the discovery of materials "prepared in anticipation of litigation or for trial" "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and that the adverse party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

O'Haver argues that 3M waived its privilege for three reasons: (1) "3M's corporate designee characterized the results of its analysis without preserving any privilege;" (2) 3M's underlying data and analysis were provided to non-lawyers outside of 3M; and (3) portions of the data and analysis were provided to non-party

20

testifying witnesses. O'Haver also argues that she "has substantial need for these materials and cannot obtain their equivalent." We first address O'Haver's waiver arguments.

"'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.'" *State ex rel. Malashock v. Jamison*, 502 S.W.3d 618, 619 (Mo. banc 2016) (quoting *State v. Driskill*, 459 S.W.3d 412, 426 (Mo. banc 2015)). While the work product privilege "may be waived by voluntary disclosure of the protected information," "[a] disclosure made in the pursuit of trial preparation and not inconsistent with maintaining secrecy against opponents" does not waive the privilege. *Edwards v. Mo. State Bd. of Chiropractic Examiners*, 85 S.W.3d 10, 27 (Mo. App. W.D. 2002).

First, O'Haver argues that 3M's corporate representative waived privilege during his deposition when discussing the internal CFD study in this colloquy:

Q:     Did you look at any internal CFD studies performed by 3M?

A:     Actually, yesterday, it was the first time that counsel shared with me a CFD that I was not aware of that was done in 2015.

. . .

Q:     What study was that? Who performed that study?

A:     The one that was shared with me yesterday, it was a CFD done by [a 3M employee] on the request from legal.

Q:     You're telling me that the only CFD internal study performed by 3M on the Bair Hugger was a study that was requested by legal?

A:     The internal one that I'm talking about, [3M employee], yes.

21

Q:      That's the only one you're aware of?

A:      That's the only one I'm aware of, yes.

3M's corporate representative later testified multiple times that he was not aware of the conclusions of the internal CFD results and had never seen them. O'Haver argues that 3M waived its privilege by not asserting the privilege when its corporate representative testified regarding the internal CFD study.

We are unpersuaded. O'Haver's argument rests upon 3M's corporate representative initially testifying at his deposition that the conclusions of the internal CFD study were "neutral." However, he later clarified that his characterization of the results was based on his assumptions of the results. Despite being questioned multiple times during his deposition, 3M's corporate representative consistently maintained that he was not aware of the results of the internal CFD study, and testified he had never seen the results of the internal CFD study and could not testify to its conclusions. Instead, 3M's corporate representative testified only about the *data* underlying the internal CFD study. O'Haver received this data during discovery and 3M never asserted any privilege over such data. Nothing in 3M's corporate representative's testimony indicates that 3M waived its asserted privilege over the results of the internal CFD study.[9]

---

[9] O'Haver also argues that the "fairness doctrine" requires this Court to determine that 3M waived its privilege because 3M uses its assertion of privilege as both a sword and

22

O'Haver also argues that 3M waived privilege by producing a "17-page CFD document" to a consulting expert hired by 3M. It is not clear from O'Haver's briefing whether this document contains the results of the internal CFD study. However, 3M states that they provided the underlying data, but not the results of its CFD study to the consulting expert. Such a disclosure is consistent with 3M's assertion of privilege over the *results* of the study and is not a waiver of 3M's privilege as to the results of the study.

But even if 3M disclosed the results of the internal CFD study to its consulting expert, such disclosure does not necessarily waive the work product privilege. As we stated above, "[a] disclosure made in the pursuit of trial preparation and not inconsistent with maintaining secrecy against opponents" does not waive the privilege. *Edwards*, 85 S.W.3d at 27. In *Edwards*, this Court held that a party did not waive work product privilege by disclosing otherwise protected material to a third-party fact witness because the disclosure was "not inconsistent with maintaining secrecy against opponents." *Id.* The same analysis applies here. *If* 3M disclosed the results of the internal CFD study to its consulting

---

a shield. O'Haver claims that 3M's corporate representative cannot characterize the results of 3M's internal CFD testing without also producing those results. As we discuss above, 3M's corporate representative testified repeatedly that he had never seen the results of any internal CFD testing. Thus, 3M's corporate representative's testimony does not invoke the fairness doctrine.

23

expert, such disclosure is consistent with maintaining secrecy against O'Haver and was made during trial preparation. It did not waive 3M's work product privilege.[10]

Next, O'Haver argues that even if 3M's internal CFD study results were protected work product, O'Haver was "entitled to the information because she had a substantial need for it and an inability to obtain a substantial equivalent." (App. Brief at 67). Rule 56.01(b)(5) allows a party to obtain discovery over documents prepared in anticipation of litigation "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and that the adverse party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

Here, O'Haver describes her "substantial need" for the results of the 3M internal CFD testing as follows:

> If 3M's internal testing (done before O'Haver's surgery) showed that the Bair Hugger disrupts operating room airflow—as Plaintiff claims— she had a substantial need for such critically relevant information. Since 3M would have every incentive to produce conclusions that supported its claim that the Bair Hugger *did not* disrupt airflow, why would it resist producing that information if it really bolstered its position?

---

[10] In contrast, if 3M had disclosed the results of the study to a testifying expert, such disclosure would constitute a waiver of the work product privilege. See *Edwards*, 85 S.W.3d at 27. Rule 56.01(b)(6)(b) requires a testifying expert to produce the material they relied on in reaching their opinion. The rule "includes both trial preparation materials and opinion work product that is given to and reviewed by the expert." *Edwards*, 85 S.W.3d at 27. O'Haver does not argue that 3M disclosed this material to a testifying expert, and thus this rule does not apply to her argument here.

O'Haver does not cite any authority to support her contention that, having already been provided the underlying data of the internal CFD, that she has a "substantial need" to also receive the conclusions drawn from the data. O'Haver also argues that her own expert's CFD testing is not the substantial equivalent of 3M's internal testing because "there is no substantial equivalent to 3M's own internal testing."

We disagree. First, O'Haver's argument that 3M asserted a privilege only because the results of its internal testing were adverse to 3M's position at trial is simply speculation. Further, even if O'Haver's assertion was not speculative, she has not demonstrated a "substantial need" as she was able to perform her own CFD testing in preparation for trial. O'Haver's position that a party can show a "substantial need" for otherwise privileged information because that party believes such information would aid their position at trial is contrary to the purpose of the work product privilege. The work product privilege allows "a lawyer [to] work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).[11] The privacy afforded to lawyers by the work product privilege applies equally to information beneficial, as well as detrimental, to the attorney's client or position at trial.

---

[11] In *Hickman*, the United States Supreme Court first recognized the work-product privilege, and Missouri has since codified the privilege in Rule 56.01 and the privilege "is now firmly established in the common law." *See State ex rel. Rogers v. Cohen*, 262 S.W.3d 648, 650 (Mo. banc 2008).

Therefore, O'Haver's statement that she believes the information would aid her position at trial, as it must be detrimental to 3M, does not establish that O'Haver has a "substantial need" for the results of 3M's internal CFD study.

Even if O'Haver established a "substantial need" for the results of the internal CFD study, which she does not, she fails to argue that she cannot otherwise obtain its "substantial equivalent." O'Haver had the data underlying 3M's internal CFD study and had an expert who testified at trial about the CFD study he conducted. O'Haver does not explain why possessing 3M's internal testing data did not allow her to produce a substantially equivalent study. 3M also presented an expert who testified about the results of a CFD study he conducted. Therefore, the jury heard competing expert testimony regarding separate CFD studies in reaching their verdict.

The trial court did not abuse its discretion in sustaining 3M's objection to producing the results of its internal CFD study because those results were privileged. Point VIII is denied.

In her final point, O'Haver argues that the trial court erred in sustaining an objection to O'Haver's closing argument that 3M kept its internal CFD testing secret from its clinical personnel and the scientific community at large because O'Haver is permitted to argue all reasonable inferences from the evidence.

26

O'Haver argues the evidence indicated that if the results of 3M's internal CFD study had been favorable to 3M, then 3M would have produced those results.[12]

O'Haver's argument centers around the same internal CFD study discussed in Point VIII. O'Haver argues on appeal that, if permitted, she would have attempted to argue two things: (1) "3M's litigation department had not just killed testing it did not like, but it also conducted testing that it kept secret from 3M's clinical personnel and the scientific community at large;" and (2) "the jury should draw a reasonable inference from the evidence—as required by MAI 3.01—that 3M would have provided its testing results if those results supported its position at trial."

---

[12] O'Haver's ninth point fails to comply with Rule 84.04 because it challenges a trial court ruling that never occurred. The citation O'Haver uses in support of her preservation statement is not to a portion of her closing argument but to a discussion that occurred during O'Haver's rebuttal evidence. Such is not sufficient to preserve her argument for our review because it does not identify the trial court ruling that O'Haver claims she is challenging. Her point relied on and preservation statement are also insufficient because they place this Court in the untenable position of acting as O'Haver's advocate by searching the record in support of O'Haver's argument.

To that end, neither O'Haver nor 3M point to any portion of the record where O'Haver attempted to argue an adverse inference from 3M's invocation of the work product privilege. Our *ex gratia* review of the record reveals a brief discussion occurred while the parties discussed whether the videotaped deposition of a 3M employee should be played during O'Haver's case-in-chief, although neither party directs us to this portion of the record. O'Haver sought to play portions of the 3M employee's deposition to the jury and 3M objected, arguing that "what [O'Haver is] seeking to do here now is to be able to play the jury deposition testimony from [the 3M employee] that would have adverse inference that there is some secret CFD done by 3M that presumably is unfavorable to 3M and that [has] been covered up by the lawyers." The trial court did not permit O'Haver to play the 3M employee's deposition during her case-in-chief but allowed her to play it during her rebuttal. O'Haver does not challenge that ruling in this appeal.

O'Haver directs this court to a statement the trial court made before allowing a portion of the 3M employee's deposition testimony to be played during O'Haver's rebuttal evidence:

| | |
|---|---|
| The Court: | So the Court is going to allow the deposition to be played....  In closing arguments there should be no argument that is made, no inference that is made regarding this study and [3M employee].  The only purpose of the introduction [is] for the impeachment of [a 3M expert].  That is what was represented to me yesterday and that's my intention as to how it is used both in its presentation to the jury as well as in closing arguments. |
| O'Haver's counsel: | Just briefly.  I did not intend to speak about [3M employee]'s deposition in closing arguments, but there was a portion of designated testimony from [3M's corporate representative]...what he acknowledge that 3M's legal department ran this test without telling the clinical side.<br><br>I intend to talk to the jury about that portion *without making an inference about any results or anything else*, just making the point that 3M's legal department directed testing and they did not tell the clinical side about it. |
| 3M's counsel: | We object, Your Honor, for the same reasons. |
| The Court: | Here's what I'll say.  If I allow that testimony in, I allowed that in through the deposition. But my ruling regarding this testing and the fact that I believe that because it was done at the direction of legal, that it is work product. I'm not going to allow any further inference to be drawn.  And if there is a request from |

28

the defendant, an objection and a request, then I'll consider what relief they're requesting at that time.

O'Haver's counsel:  Okay.

(emphasis added).

A review of O'Haver's closing argument indicates O'Haver argued in part, "You'll determine whether a medical device company can let its lawyers decide what clinical safety studies to run because of the risk of an ongoing legal situation because that's exactly what 3M did.  3M had its lawyers dictate what clinical safety testing it would do on the Bair Hugger."  O'Haver then showed the jury several exhibits where various 3M employees discussed the internal testing on the Bair Hugger.  O'Haver also argued to the jury, "The medical clinical people [at 3M] wanted to run a safety study on the Bair Hugger and 3M's lawyers stopped it cold.  Is that using ordinary care?  That's the question you get to decide."  True to her word during the colloquy above, O'Haver concluded her closing statement "without making an inference about any results or anything else."

O'Haver's point relied on directly contradicts her statements to the trial court where she states that she does *not* intend to argue any inferences from 3M's internal CFD testing.  "Parties are bound by the position they took in the trial court and will not be heard on a different theory on appeal." *Barner v. Mo. Gaming Comm'n*, 48 S.W.3d 46, 50 (Mo. App. W.D. 2001).  "We will not 'convict a trial court of error on an issue that was not put before the trial court to decide.'"

29

*Loutzenhiser v. Best*, 565 S.W.3d 723, 730 (Mo. App. W.D. 2018) (quoting *Barner*, 48 S.W.3d at 50). Further, we note upon the trial court's pronouncement in the colloquy above, O'Haver concluded the issue by acquiescing, simply stating "Okay" in response. We will not find that the trial court abused its discretion by making a ruling with which Appellant acquiesced.

Point IX is denied.

## CONCLUSION

The trial court's judgment is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.